ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

STATE OF SOUTH CAROLINA

COUNTY OF RICHLAND

IN THE COURT OF COMMON PLEAS

FOR THE FIFTH JUDICIAL CIRCUIT

Jane Doe by and through her next friend
and natural parent N.O.; M.F. by and
through her next friend, Ashley Berry,
Esq., B.D.H., B.J.H., and W.H. by and
through their next friends, Sheila Hart
and James Hart,

Individually and on behalf of all other
similarly situated children,

Plaintiffs,

v.

Prisma Health Medical Group, Midlands
Family and Child Advocacy Clinic, Olga
Rosa, M.D., Shelby Brady, FNP-C,
Jennifer Leigh Sabo, M.D., Ladonna
Alexandria Young, M.D., and Susan
Michelle Lamb, M.D.,

Defendants.

**SUMMONS**

**(JURY TRIAL DEMANDED)**

TO: DEFENDANT'S ABOVE-NAMED

    YOU ARE HEREBY SUMMONED and required to answer the Complaint in this matter, a copy of which is herewith served upon you, and to serve a copy of your Answer to the said Complaint on the subscribers at, Post Office Box 610, Camden, South Carolina 29021, within thirty (30) days after the service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

    Respectfully Submitted,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

**THE FOSTER CARE ABUSE
 LAW FIRM, PA**
*s/Deborah J. Butcher*
Deborah J. Butcher
Robert J. Butcher
S.C. Bar Numbers 74029/74722
Post Office Box 610
Camden, South Carolina 29021
Telephone: 803.432.7599
Facsimile: 803.432.7466
dbutcher@camdensc-law.com
rbutcher@camdensc-law.com

Camden, South Carolina
May 15, 2024

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF RICHLAND | FOR THE FIFTH JUDICIAL CIRCUIT |
| Jane Doe by and through her next friend and natural parent N.O.; M.F. by and through her next friend, Ashley Berry, Esq., B.D.H., B.J.H., and W.H. by and through their next friends, Sheila Hart and James Hart,<br><br>                              Plaintiffs,<br><br>v.<br><br>Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D.,<br><br>                              Defendants. | **COMPLAINT**<br>(***Jury Trial Demanded***) |

Plaintiffs, complaining of the Defendants, would show this Court the following:

## I.    Introduction.

1.      This civil rights class action seeks damages and injunctive relief compelling Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. from performing unnecessary and intrusive pediatric genitourinary exams upon children referred to them by the South Carolina Department of Social Services (SCDSS) when there are no allegations, or even suspicions, of sexual abuse.

2.      This civil rights class action is brought pursuant to 42 U.S.C. § 1983 on behalf of a class of children who presented to Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. for forensic medical exams and unnecessary and intrusive pediatric genitourinary exams with no allegations, or even suspicions, of sexual abuse.

3.    Plaintiff Children seek systemic declarative and injunctive relief to stop Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. from continuing to violate the federal constitutional and statutory rights of the putative Class.

4.    As a direct result of longstanding, well-documented failures of Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., Plaintiff Children and putative class have been and continue to be harmed physically, psychologically and emotionally and continue to be placed at ongoing risk of such harms while conducting forensic medical examinations.

5.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are victimizing and/or revictimizing the Plaintiff Children and the putative Class by performing unnecessary and intrusive pediatric genitourinary exams on children when there are no allegations, or even suspicions, of sexual abuse.

## II.    The Parties and Jurisdiction.

6.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

A.     **Plaintiffs.**

   i.  **Plaintiff Jane Doe.**

7.       Plaintiff Jane Doe is a minor child, born in April 2009. She is a resident of Kershaw County, South Carolina. Plaintiff Jane Doe's next friend, N.O., is her biological mother, a resident of Kershaw County, South Carolina. N.O. is sufficiently familiar with the facts of Jane Doe's situation and dedicated to Jane Doe's best interests to fairly and adequately represent the child's best interests in this litigation.

8.       On or about May 10, 2021, SCDSS informed the biological and custodial parent of Jane Doe that SCDSS had received the following allegations of physical abuse:

> [N.O.] is physically abusive towards her daughter ([Jane Doe] age; 12 yr. old). The reporter stated that [N.O.] sometimes makes [Jane Doe] take off her clothes except for her under garments and then beat her with a belt. The reporter stated that [Jane Doe] has a slight welt on her arm, which is fading away. It is alleged that [N.O.] hit [Jane Doe] on yesterday. It is alleged that [N.O.] limits the amount of food [Jane Doe] can eat a day. It is alleged that [Jane Doe] can sometimes only eat twice a day or nothing at all. It is alleged that [N.O.] makes [Jane Doe] wash her own cloths by hand while everyone else in the home use a washing machine. It is alleged that [N.O.] threatened to kill her if she tells anyone about the abuse in the home. It is alleged that [Jane Doe] is afraid to go home.

9.       On May 17, 2021, SCDSS sent a referral for a forensic medical exam to Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Shelby Brady, FNP-C. Under "Reason for Current Intake / Referral check all that apply", SCDSS only marked "Physical Abuse". SCDSS left the box for "Sexual Abuse" unmarked.

10.      In the narrative for "Suspect / Allegation Information", SCDSS wrote:

> It has been reported that [N.O.] is physically abusive towards her daughter [Jane Doe]. The reporter stated that [N.O.] sometime make [Jane Doe] take off her clothes except for her under garments and then beat her with a belt. The reporter stated that [Jane Doe] has a slight welt on her arm, which is

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

fading away. It is alleged that [N.O.] hit [Jane Doe] on yesterday. It is alleged that [N.O.] limits the amount of food [Jane Doe] can eat a day. It is alleged that [Jane Doe] can sometime only eat twice a day or nothing at all. It is alleged that [N.O.] makes [Jane Doe] wash her clothes by hand while everybody else in the home use a washing machine. It is alleged that [Jane Doe's] mother threaten to kill her if she tell anyone about the abuse in the home. It is alleged that [Jane Doe] is afraid to go home. The reporter stated that [Jane Doe] is currently at school (Camden Middle School).

11.      A forensic medical examination was conducted by Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Shelby Brady, FNP-C on May 25, 2001.

12.      Defendants Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are listed as Defendant Shelby Brady's supervising, or collaborating physicians. As collaborating physicians, Defendants Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. were accountable for the caliber of the work done by Defendant Shelby Brady and provided direct supervision and review of the care she delivered.

13.      In Jane Doe's Prisma Medical Records dated May 25, 2021, Shelby Brady, FNP-C wrote:

> [Jane Doe] is 12 y.o.female who presents for a medical evaluation due to concerns of: Neglect:, Emotional neglect, Physical neglect, Physical abuse, Bruise. She was seen at the PH Family Services Clinic.
> Per the referral source, [Jane Doe]'s mother is physically abusive towards her, limits her food intake, makes her hand-wash all her clothing, and has threatened to kill [Jane Doe] if she tells anyone about the abuse.
> In her forensic interview, [Jane Doe] disclosed physical abuse and reported that family members have had to restrain her mother on multiple occasions while she was hitting [Jane Doe]. See interview report for full details.
> From forensic interview:
> Forensic interview completed on 6/3/2021 and brief results reviewed.
> Outcome of the forensic interview was Disclosure of abuse, Child disclosed, Emotional Abuse, Emotional Neglect, Physical Abuse.

14.      Shelby Brady, FNP-C recorded "No history of prior injuries".

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

15. There is no mention of sexual abuse in Jane Doe's Prisma medical records.

16. During the examination, upon information and belief:

    a. Jane Doe was not simply given a physical;

    b. Instead she was asked if her father and/or brothers molested her, which she denied;

    c. She was instructed to get naked;

    d. Jane Doe told the Doctor and medical personnel several times to stop and that she did not feel comfortable and did not want to participate in the exam.

    e. Her request were denied.

    f. Because of the apparent authority of Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Shelby Brady, FNP-C, Jane Doe did not believe that she could physical resist their unwanted assault on her body.

    g. Her breasts were touched;

    h. She was made to spread her legs;

    i. Fingers and/or instruments were placed in her vagina;

    j. Fingers were used to open her vaginal area and pictures were taken;

    k. Jane Doe felt as if she were being raped.

17. By way of duplicity and fraud Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Shelby Brady, FNP-C had Jane Doe submit against her will to a full vaginal exam on May 25, 2021, and without the consent or knowledge of her mother and legal custodian, N.O. N.O. was not able to speak or read English and no staff was available to speak to N.O. in her native language.

18. Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, and Jennifer Leigh Sabo, M.D. or any of their staff failed to inform Jane Doe or her mother, N.O., that an unnecessary and intrusive pediatric genitourinary exam would be performed upon Jane Doe.

19. There were no emergency circumstances or exigent circumstances that would allow, require, or justify an unnecessary and intrusive pediatric genitourinary exam on Jane Doe.

20.     There are no laws or regulations that would require or justify this type of search and violation of Jane Doe's body.

21.     There is no medical reason to conduct a pediatric genitourinary exam when there are no allegations, or even suspicions, of sexual abuse.

22.     The allegations of child abuse against N.O. were dismissed by the Kershaw County Family Court by a bench order on June 7, 2021, and by formal order on July 16, 2021.

### ii.     Plaintiff M.F.

23.     Plaintiff M.F. is a minor child, born in June 2006. She is a citizen and resident of Richland County, South Carolina. Plaintiff M.F.'s next friend, Ashley Berry, Esquire, is a licensed attorney in who practices in Kershaw County, South Carolina. Ashley Berry, Esquire, is sufficiently familiar with the facts of M.F.'s situation and dedicated to M.F.'s best interests to fairly and adequately represent the child's best interests in this litigation.

24.     On January 24, 2023, SCDSS informed the biological and custodial parent of M.F. that SCDSS had received the following allegations of physical abuse:

> [Mother], adoptive mother lives in the home with [Plaintiff M.F.;s sister, N.F.] 16, [M.F.] 16, []. Also in the home are [Mother's Boyfriend] and [C]. Saturday night the family was having a gathering about issues going on in the home. It is alleged that one time [Mother's Boyfriend] walked in the room where [N.F.] and [M.F.] were changing and hid while the girls undressed. When this was brought up [Mother's Boyfriend] got upset and left the home (Drove off). [Mother] then kicked [N.F.] and [M.F.] out of the home. The 2 girls went to Charlotte, NC. It is alleged that [Mother's Boyfriend] also had a picture of [N.F.] saved as the screen saver on the phone. The [N.F.] and [M.F.] are getting frustrated because they are having to watch the younger kids while they are on virtual school. [Mother] goes out with [Mother's Boyfriend]. The girls are in Charlotte and [Mother] has sent someone to go get them from the home they are at.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

25.    On March 14, 2023, SCDSS sent a referral for a forensic medical exam to Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Jennifer Leigh Sabo, M.D. Under "Reason for Current Intake / Referral check all that apply", SCDSS only marked "Physical Abuse". SCDSS left the box for "Sexual Abuse" unmarked.

26.    In the narrative for "Suspect / Allegation Information", SCDSS wrote:

> The family was having a gathering about issues going on in the home. It is alleged that one time [Mother's Boyfriend] walked in the room where [M.F.] and her same-aged sibling, [N.F.], were changing and hid while the girls undressed. When this was brought up, [Mother's Boyfriend] got upset and left the home. [Mother] (adoptive mother) then kicked both girls out of the home. The 2 girls went to Charlotte, NC. It is alleged that [Mother's Boyfriend] also had a picture of [N.F.] saved as a screen saver on his phone. [N.F.] and [M.F.] are getting frustrated because they are having to watch the younger siblings while they are on virtual school. [Mother] goes out with [Mother's Boyfriend]. The girls were in Charlotte and someone was sent to go get them. [Mother] tells the kids that she doesn't want them anymore

27.    Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Jennifer Leigh Sabo, M.D. obtained information from M.F.'s and N.F.'s forensic interview, which was held before M.F.'s forensic medical examination.

28.    Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Jennifer Leigh Sabo, M.D. learned from M.F.'s forensic interview the following information:

> [M.F.] not dislcose any concerns for abuse. She stated the report was made by her sister who doesn't like her adoptive mother's boyfriend. [M.F.] stated she feels safe at home. Her physical exam, to include anogenital exam, was normal.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

29.    Defendants Prisma Health Medical Group, Midlands Family and Child

Advocacy Clinic, and Jennifer Leigh Sabo, M.D. recorded the following history:

> [M.F.] reports she lives with her (adopted) mother and siblings. When asked
> about the DSS allegation, she reported that her older sister (34 years old)
> made the report. This sister lives in Charlotte, NC and reportedly "doesn't
> like my mom's boyfriend, I don't know why". She reported that the DSS
> worker did not go into details with the family. [M.F.] reported that no one
> has done anything to her feelings or to her body to harm her. She stated "it
> was something about coming in our room but I had my blanket over me".
> She reported she has broken her hip before and has a hook-shaped scar on her
> forehead "from when I was thrown out of a car when I was 3 years old in a
> car accident". On the adolescent questionnaire, she reported she does not
> smoke, vape or use illicit drugs. She has had no suicidal thoughts or actions
> and has had no sexual relations. She started her menstrual cycle when she
> was 12 years old and her LMP was "in February".

30.    Defendants Prisma Health Medical Group, Midlands Family and Child

Advocacy Clinic, and Jennifer Leigh Sabo, M.D. learned from N.F.'s forensic interview the

following information:

> [N.F.] did not dislcose any concerns for abuse. She stated the report was
> made by her sister who doesn't like her adoptive mother's boyfriend. [N.F.]
> stated she feels safe at home. Her physical exam, to include anogenital exam,
> was normal.
>
> Of note, [N.F.] indicated previous sexual activity at 11 years of age with 2
> male peers (11 years old) at the time she lived with her biological mother.
> She denies any recent sexual activity. [N.F.] stated her adoptive mother was
> aware of this. [N.F.] also indicated a previous history of sending naked
> photos of herself to peers approximately 1 year. prior. She stated her adoptive
> mother was aware and this was the primary reason she is in counseling. She
> endorsed shame and labeled herself as "troubled."

31.    Defendants Prisma Health Medical Group, Midlands Family and Child

Advocacy Clinic, and Jennifer Leigh Sabo, M.D. recorded the following history:

> [N.F.] is adopted by her biological aunt and calls her "mom" (she and the
> biological mother have the same father). She has lived with her adopted
> mother and siblings for "2-3 years", and reports "it is great, I live with my
> biological sister and brother on my mom's side, and there are other adopted

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

kids". Prior to that, [N.F.] lived in Milwaukee with her biological mother "who didn't care about what did, she was on drugs". Per the adolescent questionnaire, it was at that time that [N.F.] had a history of sexual relations with 2 other 11 year old boys. ([N.F.] was 11 years old at the time, "it was about 5 year ago"). When asked about the DSS allegation, [N.F.] reported that it was last year at her older sister's house, who lives in Charlotte, NC and works at Bank of America. She stated "we always thought of her as a big sister, that we could tell her anything, but she twisted our words. She doesn't like our mom's boyfriend but we didn't know that". "We told her he came into our room and we had on crop tops and shorts which we're not supposed to wear, we hurried and covered ourselves and he left the room.". "The man [SCDSS Caseworker] who came to our house was told we were naked but we weren't. DSS came out to the house and then called us and mixed up our words. He wouldn't give us a report when we asked for it, he wouldn't send it".

[N.F.] states she did not tell DSS about her sexual activity when she was 11 years old, "I didn't want to do the exam because I knew I had been sexually active and was afraid the exam would show he [Mother's Boyfriend] did it, because he didn't".
She reported "I feel like I'm a troubled child, grew up doing things that adults do and I shouldn't have. I am in therapy. My mom says I'm a troubled child". She reported that she "used to get cold sores on her mouth because my biological mom had herpes and I would drink after her".
On the adolescent questionnaire, [N.F.] also reported that she had sent sexy videos "to a few people at school; I talked to my mom about it". [N.F.] stated this was one of the reasons she is currently in counseling. She reported she used to vape/smoke "a long time ago". She denied suicidal thoughts or actions. She started her menstrual cycle when she was 9 years old and her LMP was "2 weeks ago".

[N.F.] reported that she had ACL/meniscus surgery Sept. 2022. She attends school virtually.

32.     M.F. wrote the following summary of her experience with Prisma Health

Medical Group, Midlands Family and Child Advocacy Clinic, and Jennifer Leigh Sabo,

M.D.:

I arrived first with my cousin, and my sister, [N.F.]. A lady named Krystal I don't remember her last name, came when Me and [N.F.] came. She told us she doesn't work with DSS, and they would be doing vaginal exams, and if we refused to take it, it would make us look guilty. That's when I agreed to do the exam. Krystal also told us that DSS wasn't follow procedures and our

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

mom is allowed to take us and we were supposed to be able to schedule our own interview and exam. I also confined in her that I was never assaulted or touched inappropriately, like I have told Christion Nesbit[, the SCDSS Caseworker]. I remember her taking me to a back room where I completed a survey. The questions were like have I ever harmed myself, how do I feel, and things of that nature. I remember a Nurse Grey, she took me and gave my height and weight. I went into the exam room and Jennifer Sabos, came to do my medical with Nurse Grey and they brought a camera. I remember her asking me why I was there, and I said because my sisters filed a false report with DSS, and she said Oh, that's weird why would she do that? I then responded with I don't know, they don't like my mom's boyfriend and they just took it to the extreme. She then responded with that they're supposed to be family. I also told her that I wasn't touched inappropriately and that this happened last year in October and if it was a big deal, why didn't she (in reference to my sister) report it then? Then Dr. Sabo responded with yeah that doesn't make sense. She lifted up my shirt and put her stethoscope on my back and had me breathe in and out. I then had to pull down my shirt and she took a picture of my chest, arms, and my back. I then was told to pull down my pants and underwear, then she took a picture of my butt. Then she informed me that she had to take pictures and report it to show that I wasn't being abused. Then she said she was going to look at my vagina and just make sure the skin is health. Then she said I'm going to explain what I am going to do then where going to do it. First, she asked me did I want to keep my pants on and I said yes. She then asked me to open my legs and scoot all the way down at the end of the table. Then she said she is going to just check my skin the nurse kept on looking at my vagina and then back at me. Dr. Sabo then said that she was going to use a q-tip to spread my lips so she can see my vagina, she then put a flashlight on and said that it was going to be like a flower and she had to use the q tips to open it. I was uncomfortable but I couldn't say anything so I started making face at the nurse. The Nurse Grey told her I looked uncomfortable. Dr. Sabo then jabbed the q-tip up my vagina and it hurt me on the left side and I jumped off the table. She then said sorry she had no intentions of hurting me and then she ended the exam and walked me out. I then went the lobby and started adjusting my pants there was pain, and she told me if it continued after two weeks to go to a doctor. I couldn't even sit in the car normal. It hurt to wear clothes and to take them off, it hurt to walk and move. I couldn't do anything, but blame myself for what happened, I was told if I didn't do it, I would look guilty. I cried and I didn't like peeing that hurt, I couldn't even take a shower I was scared that it would hurt. Even know when I went to the doctors with my mom for my sister I was scared to be in the presence of a female doctor.

33.    M.F. also stated:

Well, first, when we got there, we signed in. I was crying and stuff saying like I didn't want to do like a vaginal exam. This lady named Crystal came

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

out, and she said, "That's not what they do here", and basically, that wouldn't happen, and if I refused to get it, they would take me from my mom, and that was my only option, to do it.

[Dr. Sabo] asked me did I take an interview yet, and I told her, no, and she said, "Well, that's weird. They normally don't do that."· And I was like, "Okay".· I mean, she told me that they wouldn't do any of that, you know.· She said they needed to take pictures of me still, and I said, "Okay". And she said -- so, I pulled down my pants and stuff, and she took pictures of my body, and then there was a Nurse Gray in there, and they told me I had to get on the table, and they were just going to like check my stomach and stuff real quick.· So, I did, and then she told me like to pull my pants down again, and then she told me to bring my legs all the way to the bottom of the table, and she said, "You might feel something cold", and I said, "Okay", and she said, "Just say something if it hurts or if you're scared", and I was like, "Okay".· And that's when Nurse Gray came, and she my hand, and then, she put something on me.· I don't know what it was.· And then she stuck something up me, and I like jumped off the table, and she said, "Well, that concludes that you can't continue, so you can pull your pants up".· And then, after that, that's when the nurse walked me back

…I went to the annual check-up, and I was like scared like started like hyperventilating and crying and stuff, and then she asked me like what was wrong, and I told her I didn't want her to touch my vagina, and that's when my mom basically -- you know, I was crying and stuff, so she explained about Dr. Sabo and basically happened, how I was violated, and then she said, well, she can see like -- she said it's like anxiety and PTSD, so she asked me would I like to see a psychiatrist.

34.    N.F. wrote the following summary of her experience with Prisma Health

Medical Group, Midlands Family and Child Advocacy Clinic, and Jennifer Leigh Sabo,

M.D.:

First we entered the building and there was a lady named Krystal. She came out from the back and told us why we were there. I told her "I'm not doing anything, I don't know about her *points to my sister* but I'm not doing it" She said "what aren't you doing" I said "I'm not doing whatever we came here to do" She said "I understand why you're concerned but I'm going to explain to you what's going on" she processed to look at me because I didn't want to do it. She told me "The examination you are doing today is an exam to check for bruises and any scars on your body. It's not anything else other than that. I can see that you are concerned because you think it's gonna be something it's not." I loosened up because I actually believed what she said. Ms. Krystal also expressed to me that if I didn't take the exam that it would

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

make the case worse and make it look like [Mothe's Boyfriend] actually did something. I told her the reason why I didn't feel comfortable doing it and I told her" I don't feel comfortable with being touched in my private area being that nothing happened and I know nothing happened". After she told me what the exam was for I told her I was ok with doing it. We then went into the back where the rooms were and I told the nurse that I wanted to go first because I wanted to know how much I weighed. The nurse took my height and weight and after that I thought I was going back out to the lobby with my cousin but instead she told me "Okay since you decided to go first for the height and weight it's time for your exam so let's go into this room right here." We went into the room and the nurse and Ms. Sabo started asking me questions about me, she started asking me my favorite color, things I plan on doing after high school, my age, things I like to do for fun and things like that. I answered all of her questions and she told me that she wanted to know how things were at home and I told her everything it good and she was like do you get into any trouble while being at home and I told her yes I have gotten into some trouble but it's not like anything that needs to be spoken on. We then stopped talking and she asked me what happened with the situation with [Mother's Boyfriend]. I told her what happened and this is what I told her. "[Mother's Boyfriend] was playing hide and seek with my little sister [K] and he came into our([[M.F.]/[N.F.]) room and he came and left right back out because he saw that we were in there. I was wearing a crop top and shorts." I also told her there was nothing that happened again and I told her this was all unnecessary, she didn't say anything when I told her that. After that conversation she started looking at my arms, back, legs and neck. She told me I had nice skin and nothing was there (bruises). She then told me to come onto the bed and lay down. I was confused what that was for until she told me to pull my pants down. She told me that she had to check my private area. I told her I didn't wanna do it because that's not what I was told was gonna happen. She told me "it's gonna be okay, it'll be really quick" she also told me that it has to happen because she was told to do it. I still repeatedly told her I didn't wanna do it and I didn't feel comfortable doing that. She then got a Q-tip. I asked her what the q-tip was for and she didn't explain it well. She began using medical words I didn't even know existed. I was confused hearing her say words like that. I told her I wasn't ready and I wasn't gonna be ready because I don't know what to expect and in my head I'm just thinking "can she please stop please. I don't want to do this, it hurts." She kept going regardless of what I said and she tried to give me fidget toys expecting that to work. Ms. Sabo finally finished and she told me that it was time to turn on my side so she could look at my bottom. I said "oh my gosh I thought you were done...(annoyed attitude). She said almost, she then looked at my bottom and she told me it was time for me to pull my pants up. We were done with that and it was time for me to go back into the lobby after I grabbed a snack and a journal. We entered back into the lobby and I told my cousin that it felt like I was losing my virginity all over again. I also told her

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

that I didn't know why she used the q-tip and so I asked the front desk if they could call Ms. Krystal back in the lobby so I could ask her why she used the q-tip and Ms. Krystal went to the back and asked if what was it for, Ms. Sabo told her it was because my vaginal lips are big so she needed it to open my lips, she used a metal plier like tool so don't understand why she had to use it for that if she already had something. I still didn't feel comfortable so I told Mr. Krystal I was just ready to go home and take a shower because I didn't feel clean and I didn't like the feeling of being touched for no reason at all. Ms. Sabo also used the q-tip and rolled it inside of me so that didn't make sense to me either. It was like she was saying that she used it for my vaginal lips and then said she's using it for something else. COMMUNICATION IS TERRIBLE THROUGHOUT THIS ENTIRE PROCESS(CASE). That was the end of the medical examination.

35.     During the forensic medical examination, upon information and belief:

    a.    M.F. was asked if anyone molested them, which they denied;
    b.    M.F. was made to get naked;
    c.    Because of the apparent authority of SCDSS and medical providers, M.F. did not believe that she could physically resist the unwanted assault on her body.
    d.    M.F.'s body was touched by strangers;
    e.    M.F.'s vagina was touched by strangers;
    f.    Fingers and/or instruments were placed in M.F.'s vagina causing pain;
    g.    Pictures were taken;
    h.    M.F. felt as if she was being raped.

36.     The medical exams were normal.

37.     Approximately four months later M.F.'s mother received a Notice of Unfounded Investigations/Assessments from Defendant SCDSS stating that the allegations had been determined to be unfounded on March 21, 2023. This was two days prior to the forensic medical exams Defendants had conducted on M.F. and the forensic medical examination was unnecessary.

        iii.        **Plaintiffs B.D.H., B.J.H., and W.H.**

38.     Plaintiffs B.D.H., B.J.H., and W.H. are brothers.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

39.    Plaintiff B.D.H. is a minor child, born in October 2012. He is a citizen and resident of Chester County, South Carolina. Plaintiff B.J.H. is a minor child, born in June 2016. He is a citizen and resident of Chester County, South Carolina. Plaintiff W.H. is a minor child, born in August 2020. He is a citizen and resident of Chester County, South Carolina. Plaintiffs B.D.H., B.J.H., and W.H.'s next friends are Sheila Hart and James Hart, who are citizens and residents of Chester County, South Carolina. Sheila Hart and James Hart are sufficiently familiar with the facts of B.D.H., B.J.H., and W.H.'s situation and dedicated to B.D.H., B.J.H., and W.H.'s best interests to fairly and adequately represent the children's best interests in this litigation.

40.    On May 12, 2021, SCDSS informed the biological and custodial parents of B.D.H., B.J.H., and W.H. that SCDSS had received the following allegations of physical abuse and exposure to domestic violence:

> James Hart and Shelia Fowler are the parents of [B.J.H.] (4) and [B.D.H.] (8). It has been reported that James was physically abusive towards Shelia on 05/11/2021. James threw Shelia on the floor and began to kick her. About a week ago James choked Shelia. Both incidents happened in the presence of the children. James has also thrown [B.D.H.] on the bed and hit him (no marks/bruises).

41.    On May 13, 2021, SCDSS informed the biological and custodial parents of B.D.H., B.J.H., and W.H. that SCDSS had received the following allegations of physical abuse:

> There are concerns that on May 12,2021 minor child [B.D.H.] (8) was left in the basement of any the home without lights or a window and was not given dinner, allegedly for "Talking to much", There are also concerns that [B.D.H.] was observed on May 13,2021 with bruising on his arms that appeared to be yellow and purple in color and resembles finger prints. There are concerns that the explanation for the bruise, was that the child fell off of a ladder but the injuries to not match the explanation. There are concerns that both children [B.D.H.] and [B.J.H.] (4) seem fearful. The children reside with their parents Sheila Fowler and James Hart.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

42.     On May 18, 2021, SCDSS sent a referral for a forensic medical exam to Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, and Shelby Brady, FNP-C. Under "Reason for Current Intake / Referral check all that apply", SCDSS only marked "Physical Abuse". SCDSS left the box for "Sexual Abuse" unmarked.

43.     Defendants Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are listed as Defendant Shelby Brady's supervising, or collaborating physicians. As collaborating physicians, Defendants Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. were accountable for the caliber of the work done by Defendant Shelby Brady and provided direct supervision and review of the care she delivered.

44.     In the narrative for "Suspect / Allegation Information" for B.D.H., B.J.H., and W.H., SCDSS wrote:

> B.D.H. had multiple marks and bruises on his arms and face. He told 3 of his teachers/school officials that he was put in a basement. He told DSS that he fell off a mary-go-round at school.

45.     In B.D.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady, FNP-C wrote:

> [B.D.H.] is 8 y.o. male who presents for a medical evaluation due to concerns of: Physical abuse: Bruise
> He was seen at the PH Family Services Clinic
> Present at the appointment: grandmother Patricia Hart provided past medical history. His primary resident is In Chester county.
> Per referral source, [B.D.H.] had multiple bruises on his arms and face and he told school officials that he was put in a basement. [B.D.H.] reportedly told DSS the injuries resulted from falling on the playground.
> Per DSS, since the initial incident, [B.D.H.] has had new bruising to the undersides of his arms.
> During his medical exam today, [B.D.H.] reported that he told his teachers that his bedroom feels like a basement because it is cold and dark. [B.D.H.] reports that at home when. he gets in trouble, he "usually gets spankings,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

sometimes on an arm or leg". He reports that his parents spank him with a belt and that he has had marks left on his skin by the belt.

46.    In B.D.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady,

FNP-C wrote the following assessment:

> [B.D.H.] is an eight year old male being evaluated today for suspected physical abuse. Per referral source, [B.D.H.] had multiple bruises on his arms and face and he told school officials that he was put in a basement. [B.D.H.] reportedly told DSS the Injuries resulted from falling on the playground. [B.D.H.] has not had a forensic Interview at this time.
>
> [B.D.H.]'s exam today is normal. A normal exam does not exclude physical abuse because injuries heal. During his medical exam today, [B.D.H.] reported that he told his teachers that his bedroom feels like a basement because it is cold end dark. [B.D.H.] reports that at home when he gets in trouble, he "usually gets spankings, sometimes on an arm or leg". He reports that his parents spank him with a belt and that he has had marks left on his skin by the belt.
>
> Photographs provided by DSS show an approximately circular brown bruise to the underside of [B.D.H.]'s left upper arm, a brown/yellow bruise approximately shaped like a flower bouquet to the underside of the right upper arm, and a scabbed abrasion and erythema to the left lateral eyebrow extending down to the zygomatic (cheek) bone. Bruises occur from blunt force trauma to the skin that causes blood vessels to become damaged and leak blood into the surrounding tissue. Abrasions occur from frictional trauma to the skin that causes the top layer of skin to slough off. Per DSS, the abrasion to [B.D.H.]'s eye is from an altercation with another student at his school. Per DSS the incident was witnessed and the other child reportedly kicked [B.D.H.] in the face. At this time, this injury is not concerning for physical abuse. The underside of the upper arm is a protected part of the body ihat is not usually injured in normal play or activity. The reported history of falling on the playground is not likely to cause these injuries. In the absence of a plausible history for bruise, to both arms in this location and [B.D.H.]'s disclosure of being hit with a belt at home, these bruises are concerning for physical abuse.
>
> At this time, based on the available Information including [B.D.H.]'s disclosure during his medical exam of being hit with a belt and having marks from the belt and the concerning bruises seen in photographs provided by DSS, there is concern for physical abuse in the home.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

47.     In B.J.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady,

FNP-C wrote:

> [B.J.H.] is 5 y.o.male who presents for a medical evaluation due to concerns of: Physical abuse:
> He was seen at the PH Family Services Clinic
> Present at the appointment:grandmother Patricia Hart provided past medical history, His primary resident is in Chester county.
> Per referral source, Brandan's brother [B.D.H.] had multiple bruises on his arms and face and he told school officials that he was put in a basement. [B.D.H.] reportedly told DSS the injuries resulted from falling on the playground. [B.J.H.] has not had a forensic interview at this time.

48.     In B.D.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady,

FNP-C wrote the following assessment:

> [B.J.H.] is a four year old male being evaluated today for suspected physical abuse. Per referral source, [B.J.H.]'s brother [B.D.H.] had multiple bruises on his arms and face and he told school officials that he was put in a basement. [B.D.H.] reportedly told DSS the injuries resulted from falling on the playground. [B.J.H.] has not had a forensic interview at this time.
>
> On exam today [B.J.H.] has healing abrasions to his left and rights shin. [B.J.H.] stated that the abrasions are from falling on the playground. Due to the location of the abrasions on a body part that is easily and commonly injured in normal play and activity, these abrasions are not concerning for physical abuse at this time. The rest of [B.J.H.]'s exam today is normal. A normal exam does not exclude physical abuse because injuries heal.
>
> At this time based on the available information,physlcal abuse undetermined. [B.J.H.] maybe at risk of physical abuse due to the concerning bruises found on his brother and the disclosure his brother [B.D.H.] made stating that [B.D.H.] gets hit with a belt by the children's parents.

49.     In W.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady, FNP-

C wrote:

> [W.H.] Is 10 m.o.male who presents for a medical evaluation due to concerns of: Physical abuse: Threat of harm
> He was seen at the PH Family Services Clinic
> Present at the appointment:grandmother Patricia Hart provided past medical history. His primary resident is in Chester county,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

Per the referral source, Waylon's brother had bruising to his face and arms and stated that he was put in a basement.

50.    In W.H.'s Prisma Medical Records dated May 24, 2021, Shelby Brady, FNP-C wrote the following assessment:

> [W.H.] is a ten month old male being evaluated today for suspected physical abuse. Per the referral source, [W.H.]'s brother had bruising to his face and arms and stated that he was put in a basement.
>
> [W.H.]'s exam today is normal. A skeletal survey was completed due to the allegations of physical abuse in the home and the results are normal with no evidence of acute or healing fractured. A normal exam does not exclude physical abuse because injuries heal.
>
> At this time, based on the available information, physical abuse is undetermined. [W.H.] may be at risk of physical abuse due to the disclosure made by his older brother and the concerning bruising found on his older brother.
> Recommend forensic Interviews for [W.H.]'s siblings

51.    During the forensic medical examination:

   a.    B.D.H., B.J.H., and W.H. were asked if anyone molested them, which they denied;
   b.    Each child was made to get naked;
   c.    Because of the apparent authority of SCDSS and medical providers, B.D.H., B.J.H., and W.H. did not believe that they could physically resist their unwanted assault on their bodies.
   d.    The bodies of B.D.H., B.J.H., and W.H. were touched by strangers;
   e.    The penises of B.D.H., B.J.H., and W.H. were held and touched by strangers;
   f.    Fingers and/or instruments were placed in their anus;
   g.    Pictures were taken;
   h.    B.D.H., B.J.H., and W.H. felt as if they were being raped.

52.    The medical exams were normal.

53.    On or about December 7, 2021, SCDSS dismissed its case against James and Sheila Hart.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

**B.    Defendants.**

54.    Defendant Prisma Health, is one of the largest medical groups in the country, providing medical services to over 1.5 million patients annually. It is a nonprofit organization domesticated in South Carolina. Its registered agent is CT Corporation System located at 2 Office Park Court – Suite 103, Columbia, South Carolina 29223. Prisma Health Medical Group was responsible for ensuring operations at its pediatric clinic and to provide safe and competent care to its minor patients.

55.    Defendant Prisma Health provides comprehensive medical evaluations, or Forensic Medical Examinations, for children with concerns of abuse or neglect throughout the State of South Carolina for:

    a.    Midlands Family and Child Advocacy Clinic in Columbia, South Carolina.
    b.    Metropolitan Child Advocacy Center in Columbia, South Carolina.
    c.    Child Advocacy Center of Aiken County in Aiken, South Carolina.
    d.    Edisto Child Advocacy Center in Orangeburg, South Carolina.
    e.    Safe Passage Child Advocacy Center in Rock Hill, South Carolina.
    f.    The Julie Valentine Center in Greenville, South Carolina.
    g.    Beyond Abuse in Greenwood, South Carolina.
    h.    Beyond Abuse in Clinton, South Carolina.
    i.    First Light in Anderson, South Carolina.
    j.    Spartanburg Alliance, in Spartanburg, South Carolina.

56.    At all relevant times, Prisma Health held itself out as a modern competent medical facility that included trained and skilled physicians.

57.    Prisma Health had the right or power to direct and control the way its employees and/or agents provided care and operate the business of delivering medical and non-medical care for a fee through its facilities.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

58.    Prisma Health had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

59.    Prisma Health had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities and clinics.

60.    Prisma Health had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Defendant.

61.    Defendant Midlands Family and Child Advocacy Clinic, located at 9 Richland Medical Park Drive, Suite 420, Columbia, South Carolina 29203. Defendant Midlands Family and Child Advocacy Clinic is a medical clinic operating under Prisma Health. Its website states that its "pediatric child abuse team provides comprehensive medical evaluations for children with concerns of abuse or neglect throughout the upstate of South Carolina." It only accepts referrals from South Carolina Department of Social Services (SCDSS), law enforcement agencies, or a medical provider. Almost all referrals are made by South Carolina Department of Social Services (SCDSS).

62.    Defendants Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are employed at the Midlands Family and Child Advocacy Clinic by Prisma Health.

63.    Defendant Olga Rosa, M.D., a physician licensed by the South Carolina Medical Board with specialties in Pediatrics and Pediatric Child Abuse. She is the Director

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

for Prisma Health's Child Abuse Pediatrics Care Team and is responsible for its policies, procedures, and practices. Defendant Olga Rosa, M.D. is a citizen and resident of Richland County, South Carolina.

64.     Defendant Shelby Brady, FNP-C, is a nurse licensed by the South Carolina Nursing Board as an Advance Practice Nurse and Registered nurse. She provides medical services at Midlands Family and Child Advocacy Clinic and is a citizen and resident of Mecklenburg County, North Carolina.

65.     Defendant Jennifer Leigh Sabo, M.D., a physician licensed by the South Carolina Medical Board with specialties in Pediatrics. She provides medical services at Midlands Family and Child Advocacy Clinic and is a citizen and resident of Lexington County, South Carolina.

66.     Defendant Ladonna Alexandria Young, M.D., is listed as Defendant Shelby Brady's supervising, or collaborating physician. As a collaborating physician, Defendant Ladonna Alexandria Young, M.D., was accountable for the caliber of the work done by Defendant Shelby Brady and provided direct supervision and review of the care she delivered. Defendant Ladonna Alexandria Young, M.D., allowed Defendant Shelby Brady to conduct intrusive and unnecessary pediatric genitourinary examinations when there were no allegations, or even suspicions, of sexual abuse.

67.     Defendant Susan Michelle Lamb, M.D. is listed as Defendant Shelby Brady's supervising, or collaborating physician. As a collaborating physician, Defendant Susan Michelle Lamb, M.D., was accountable for the caliber of the work done by Defendant Shelby Brady and provided direct supervision and review of the care she delivered. Defendant Susan Michelle Lamb, M.D., allowed Defendant Shelby Brady to conduct

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

intrusive and unnecessary pediatric genitourinary examinations when there were no allegations, or even suspicions, of sexual abuse.

### C.    Jurisdiction.

68.    This Court has jurisdiction and authority to adjudicate Plaintiffs' claims under South Carolina's Uniform Declaratory Judgments Act, S.C. Code Ann. § 15-53-20, and the Court's general legal and equitable powers, including its authority to enforce the South Carolina Constitution as against countervailing state law.

69.    This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §1983, *Martinez v. California*, 444 U.S. 277 (1980), 18 U.S.C. §1964(c), *Tafflin v. Levitt*, 493 U.S. 455 (1990), S.C. Code Ann. § 15-78-100(b), and S.C. Code Ann. §36-2-803 and has personal jurisdiction over the parties

70.    Venue is proper in this Court pursuant to S.C. Code Ann. § 15-7-20 because the majority of the parties are located in Richland County and the tortious and unconstitutional acts by the Defendants occurred in Richland County.

### III.    Background.

71.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

72.    The South Carolina Children's Advocacy Medical Response System "coordinates and administers child abuse medical service resources for the State, assisting and collaborating with children's advocacy centers and state agencies charged with the

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

investigation, assessment, treatment, and prosecution of child abuse or neglect for children

in the State." S.C. Code Ann. § 63-11-430(A).

   a.  The program shall develop, support, and maintain a consistent quality
       standard of care and practice for the following services intrinsic to the
       assessment of children with suspected abuse or neglect:
       i.    forensic medical examinations, assessments, and diagnoses;
       ii.   medical consultations;
       iii.  participation in multidisciplinary team case conferences and
             reviews; and
       iv.   medical expert witness services.
   b.  The program also shall develop, support, and maintain:
       i.    guidelines for the educational, clinical training, and
             professional development requirements of health care
             providers participating in the forensic medical assessment of
             children who are suspected victims of child abuse or neglect;
       ii.   a standardized clinical assessment tool to report the findings
             of the forensic medical assessment; and
       iii.  guidelines for the South Carolina Department of Social
             Services and law enforcement agencies on when to obtain a
             forensic medical assessment.

S.C. Code Ann. § 63-11-430(B & C).

73.    "In the investigation of a known or suspected crime against a child, a

multidisciplinary team must follow the South Carolina Child Abuse Response Protocol as

developed by the South Carolina Children's Justice Act Task Force and the South Carolina

Network of Children's Advocacy Centers." S.C. Code Ann. 63-11-2400.

74.    "The South Carolina Children's Justice Act Task Force and the South

Carolina Network of Children's Advocacy Centers shall develop and provide initial training

on the protocol and updated training as needed for this purpose. The protocol must be

publicly available and must be annually reviewed and updated as needed by an advisory

committee known as the Child Abuse Protocol Review Committee." S.C. Code Ann. 63-11-

2410(A).

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

75.    "Children's Advocacy Centers" mean centers which must coordinate a multi-agency response to child maltreatment and assist in the investigation and assessment of child abuse. These centers must provide:

    (1)    a neutral, child-friendly facility for forensic interviews;
    (2)    the coordination of services for children reported to have been abused;
    (3)    services including, but not limited to, forensic interviews, forensic medical examinations, and case reviews by multidisciplinary teams to best determine whether maltreatment has occurred; and
    (4)    therapeutic counseling services, support services for the child and nonoffending family members, court advocacy, consultation, and training for professionals who work in the area of child abuse and neglect, to reduce negative impact to the child and break the cycle of abuse.

S.C. Code Ann. 63-11-310(A).

76.    Children's Advocacy Centers must establish memoranda of agreement with governmental entities charged with the investigation and prosecution of child abuse. Children's Advocacy Centers must be fully accredited by the National Children's Alliance or must be an associate/developing or affiliate member of the South Carolina Network of Children's Advocacy Centers and be actively pursuing full accreditation with the National Children's Alliance within the next two years. S.C. Code Ann. 63-11-310(B)(1).

77.    Children's Advocacy Centers must establish written policies and procedures for standards of care including, but not limited to, the timely intervention of services between initial contact with the child and the event which led to the child's being referred to the center. Children's Advocacy Centers must make available these written policies and procedures to all professionals who provide services relating to the investigation, treatment, and prosecution of child abuse and neglect within the geographical vicinity of the center. S.C. Code Ann. 63-11-310(B)(2).

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

78.     Children's Advocacy Center records must be released to the Department of Social Services for purposes of investigation, assessment of allegations of child abuse or neglect, and provision of treatment services to the children or their families. The records must be released to law enforcement agencies and circuit solicitors or their agents who are:

(a)     investigating or prosecuting known or suspected abuse or neglect of a child;
(b)     investigating or prosecuting the death of a child;
(c)     investigating or prosecuting any crime against a child; or
(d)     attempting to locate a missing child.
This provision does not preclude or override the release of information based upon a subpoena or court order, unless otherwise prohibited by law.

S.C. Code Ann. 63-11-310(B)(3).

79.     A Children's Advocacy Center (CAC) "must be defined as a nationally accredited agency by the National Children's Alliance and/or the Children's Advocacy Center must be a member of the South Carolina Network of Children's Advocacy Centers and working towards accreditation." South Carolina Child Abuse Response Protocol, *99 (May 7, 2021).

80.     "All children and families with an allegation of, or concern for, abuse will be referred to the Children's Advocacy Center for forensic interviews, forensic medical evaluation, multidisciplinary assessment (including mental health), and coordination of services." South Carolina Child Abuse Response Protocol, *99 (May 7, 2021).

81.     "The Children's Advocacy Center is an integral part of investigations conducted by DSS and law enforcement, including joint investigation. When a forensic interview of a child is required at any time during the investigation, it must be conducted through a CAC." South Carolina Child Abuse Response Protocol, *99 (May 7, 2021).

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

82.    "SC Children's Advocacy Medical Response System is a comprehensive resource system that assists the South Carolina Network of Children's Advocacy Centers and the state's children's hospitals by developing and sustaining a consistent quality standard of care for the delivery of medical services for allegations of child maltreatment. The system has a network of child abuse pediatricians and other healthcare providers statewide that have met the educational and practice standards to perform forensically sound medical evaluations of alleged child victims of maltreatment." South Carolina Child Abuse Response Protocol, *104 (May 7, 2021). See also, South Carolina Children's Advocacy Medical Response System Act, S.C. Code Ann. 63-11-400, *et seq*.

83.    The purpose of a forensic medical evaluation

    a.    To assess the physical, developmental, behavioral, and mental health of the child and identify unmet needs.
    b.    To evaluate child's clinical findings or injuries and determine if such findings are physical evidence of abuse or from a non-abuse related medical condition.
    c.    To screen for sexually transmitted infections (STI) when appropriate, then diagnose and treat if an infection is identified and interpret the significance of such infections for investigatory agencies.
    d.    To answer questions about the child's physical wellbeing and possible prognosis or outcome and provide recommendations for treatment
    e.    To provide accurate documentation for legal purposes and explain to investigatory agencies, a lay jury, and judge the results of the evaluation and medical opinion as to the likelihood of abuse. Also, in the absence of physical findings, provide expert opinion or testimony to explain this lack of medical evidence.

South Carolina Child Abuse Response Protocol, *104 (May 7, 2021).

84.    The need for and timing of a medical evaluation is determined by the clinical presentation of the child in consultation with the SCCAMRS[1] qualified healthcare provider.

---

[1] South Carolina Children's Advocacy Medical Response System

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

Upon receipt of a report of abuse or neglect by an investigatory agency, a referral for a forensic medical evaluation must be made as soon as possible, but no later than 3 working days, to a child abuse pediatrician (CAP) or a physician, nurse practitioner, or physician assistant (known as healthcare providers) who is qualified by the SC Children's Advocacy Medical Response System pursuant to section S.C. Code Ann. § 63-11-430 when the presenting case includes:

    a.    Bruises anywhere on a child under 1 year of age who is not pulling to stand.
    b.    Children under the age of 2 with presence of at least one of the following:
        i.    Head injury
        ii.    Any fracture
        iii.    Any burn
        iv.    Chest and/or abdomen injury
    c.    Bruising located on face, ears, neck, chest, back, buttocks, or genital area; or bruises elsewhere with a pattern or multiple in number.
    d.    Any report alleging sexual abuse of a child, including sexual exploitation/trafficking.
    e.    Any sexually transmitted infection in a child eleven years of age or younger.
    f.    Any family in which one or more children has been pronounced dead on arrival at a hospital or other health care facility, or has been injured and later died, as a result of suspected abuse, abandonment, or neglect, when any sibling or other child remains in the home.
    g.    Child exposed to the manufacture of methamphetamine or other hazardous drugs (clandestine labs), or lives in or is exposed to an environment where drugs, including pharmaceuticals, are used, possessed, sold and/or traded/trafficked.
    h.    Child witness to violence, including but not limited to domestic violence/intimate partner violence.

South Carolina Child Abuse Response Protocol, *105 (May 7, 2021).

85.    The purpose of a forensic medical examination is to gather evidence for the state of South Carolina in criminal cases and child protective services cases.

    **a.    Pediatric genitourinary exams are conducted when there are allegations or suspicions of sexual assault.**

86.    In "The Evaluation of Suspected Child Physical Abuse", authored by Cindy W. Christian, M.D., and published by the American Academy of Pediatrics in May 2015,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

there are no recommendations for genitourinary exams to by conducted on children who may have been physically abused.[2]

87.    Since 1994, studies have confirmed that in legally confirmed cases of child abuse, the majority of children with legally confirmed sexual abuse will have normal or nonspecific genital findings.[3] The study confirmed that abnormal anal findings and abnormal genital findings are rarely found. "Medical providers and other members of multidisciplinary teams working with children who may have been sexually abused are advised to remember that medical findings are rarely the most important part of an evaluation for suspected sexual abuse."[4]

88.    Studies show that injuries to girls' genital tissues heal rapidly after genital injury.[5] "Therefore, in cases where an examination is conducted several days, weeks, or

---

[2] Christian CW COMMITTEE ON CHILD ABUSE AND NEGLECT. The Evaluation of Suspected Child Physical Abuse. Pediatrics. 2015;135(5):e20150356,

[3] Adams JA, Harper K, Knudson S, Revilla J. Examination findings in legally confirmed child sexual abuse: it's normal to be normal. Pediatrics. 1994 Sep;94(3): 310-7; Adams JA, Farst KJ, Kellogg ND. Interpretation of Medical Findings in Suspected Child Sexual Abuse: An Update for 2018. J Pediatr Adolesc Gynecol. 2018 Jun;31(3):225-231. Erratum in: J Pediatr Adolesc Gynecol. 2018 Dec;31(6):655; Smith TD, Raman SR, Madigan S, et al. Anogenital findings in 3569 pediatric examinations for sexual abuse/assault. J Pediatr Adolesc Gynecol. 2018 Apr; 31(2):79-83.

[4] Adams JA. Medical evaluation of suspected child sexual abuse: 2011 update. J Child Sex Abus. 2011 Sep;20(5):588-605

[5] McCann, J., MiyaII1oto, S., Boyle, C., & Rogers, K. (2007a). Healing of hymenal injuries in prepubertal and adolescent girls: A descriptive study. Pediatrics, 119(5), el094-el 106; McCann, J., Miyamoto, S., Boyle, C., & Rogers, K. (2007b). Healing of nonhymenal genital injuries in prepubertal and adolescent girls: A descriptive study. Pediatrics, 120(5), 1000-1011; Myhre AK, Bratlid D, Berntzen K. Genital anatomy in non-abuse preschool girls. Acta Pædiatrica 2003; 92: 1453–62; Adams JA. Understanding Medical Findings in Child Sexual Abuse: An Update For 2018. Acad Forensic Pathol. 2018 Dec;8(4):924-937; Berenson AB, Grady JJ. A longitudinal study of hymenal development from 3 to 9 years of age. J Pediatr. 2002;140(5):600–607; Berenson AB, Chacko MR, Wiemann CM, Mishaw CO, Friedrich WN, Grady JJ. A case-control study of anatomic changes resulting from sexual abuse. Am J Obstet Gynecol. 2000;182(4):820–834; Anderst J, Kellogg N, Jung I. Reports of repetitive penile-genital penetration often have no definitive evidence of penetration. Pediatrics. 2009 Sep;124(3):403-9.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

months after the suspected episode of sexual abuse and no clear sign of injury to the genital tissues is evident, the possibility of previous injury cannot be ruled out."[6]

    a. One study found that "signs of acute trauma, such as bruising, abrasions, and lacerations are rare in children who are examined for possible sexual abuse. "For children under 12 years of age, acute genital injuries were seen in 14.2% of children examined within 72 hours of the abuse, and injuries were found in only 4.5% of children examined more than 72 hours following the abuse."[7]

    b. Another study of 36 pregnant adolescent girls who presented for sexual abuse examinations found that only 2 (5.6%) had genital findings indicative of penetration despite the fact that all had been pregnant.[8]

    c. Studies on nonabused prepubertal girls, has clearly shown that findings such as the appearance of an irregular hymen (with bumps or shallow notches), a rim of hymen posteriorly which appears relatively narrow, and exposure of the intravaginal contents are all common in non-abused subjects.[9]

---

[6] Adams JA. Medical evaluation of suspected child sexual abuse: 2011 update. J Child Sex Abus. 2011 Sep;20(5):588-605.

[7] Smith TD, Raman SR, Madigan S, et al. Anogenital findings in 3569 pediatric examinations for sexual abuse/assault. J Pediatr Adolesc Gynecol. 2018 Apr; 31(2):79-83; Adams JA. Understanding Medical Findings in Child Sexual Abuse: An Update For 2018. Acad Forensic Pathol. 2018 Dec;8(4):924-937.

[8] Kellogg ND, Menard SW, Santos A. Genital anatomy in pregnant adolescents: "normal" does not mean "nothing happened." Pediatrics. 2004 Jan;113(1 Pt 1):67-9.

[9] Adams JA. Normal studies are essential for objective medical evaluations of children who may have been sexually abused. Acta Paediatr. 2003 Dec;92(12):1378-80 (Citing Myhre AK, Bratlid D, Berntzen K. Genital anatomy in non-abuse preschool girls. Acta Pædiatrica 2003; 92: 1453–62; Heger AH, Ticson L, Guerra L, Lister J, Zaragoza T, McConnell G, et al. Appearance of the genitalia in girls selected for nonabuse: review of hymenal morphology and nonspecific findings. J Pediatr Adolesc Gynecol 2002; 15: 27–35.).

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

89.    Pediatric genitalia injuries in general comprise a small fraction of this population, with an incidence ranging 0.2–8% of all reported pediatric trauma cases.[10]

a.    From the 303,992 female pediatric trauma patients ≤ 16 years old between years 2007 and 2015, 3,206 (1.1%) were identified to have genitalia trauma.[11]

b.    The most common mechanisms of injury to genitalia were being pedestrian struck (45.6%) and blunt injury not including pedestrian struck, falls, and motor vehicle and bicycle accidents (15.4%), followed by abuse not including rape (6.8%), falls (6.7%), bicycle accidents (5.5%), motor vehicle accidents (5.1%), stab wounds (4.2%), and rape (3.6%).[12]

c.    The most common mechanisms of vaginal injury were being pedestrian struck (46.8%) and blunt injury not including pedestrian struck, falls, and motor vehicle and bicycle accidents (11.7%), followed by abuse not

---

[10] Scheidler MG, Schultz BL, Schall L, Ford HR (2000) Mechanisms of blunt perineal injury in female pediatric patients. J Pediatr Surg 35(9):1317–1319; Tarman GJ, Kaplan GW, Lerman SL, McAleer IM, Losasso BE (2002) Lower genitourinary injury and pelvic fractures in pediatric patients. Urology 59(1):123–126 (discussion 126); Spitzer RF, Kives S, Caccia N, Ornstein M, Goia C, Allen LM (2008) Retrospective review of unintentional female genital trauma at a pediatric referral center. Pediatr Emerg Care 24(12):831–835; Casey JT, Bjurlin MA, Cheng EY (2013) Pediatric genital injury: an analysis of the National Electronic Injury Surveillance System. Urology 82(5):1125–1130.

[11] Fan SM, Grigorian A, Chaudhry HH, Allen A, Sun B, Jasperse N, Albertson S, Nahmias J. Female pediatric and adolescent genitalia trauma: a retrospective analysis of the National Trauma Data Bank. Pediatr Surg Int. 2020 Oct;36(10):1235-1241.

[12] Fan SM, Grigorian A, Chaudhry HH, Allen A, Sun B, Jasperse N, Albertson S, Nahmias J. Female pediatric and adolescent genitalia trauma: a retrospective analysis of the National Trauma Data Bank. Pediatr Surg Int. 2020 Oct;36(10):1235-1241.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

including rape (8.9%), falls (5.9%), rape (5.4%), motor vehicle accidents (5.2%), bicycle accidents (4.7%), and stab wounds (4.2%).[13]

90.    Similarly, the finding of marked, immediate anal dilation in the absence of other predisposing factors is a rare finding in both abused and nonabused children.[14]

91.    In fact, abnormal anal and genital findings are most likely to be discovered within 72 hours of a sexual assault.

92.    Another reason for a lack of injury in prepubertal children is that the type of abuse (e.g., touching, fondling, oral genital contact) does not cause injury.[15]

   a.    Force and restraint is not commonly used when engaging the vast majority of children in sexually inappropriate activities.

   b.    Because of this, few children will have obvious sequelae of abuse in the form of serious injuries which heal with well delineated and diagnostic findings.

   c.    Further complicating the ability to recognize changes in genital anatomy as the result of sexual abuse is the fact that few children disclose their abuse immediately following the abusive event.

---

[13] Fan SM, Grigorian A, Chaudhry HH, Allen A, Sun B, Jasperse N, Albertson S, Nahmias J. Female pediatric and adolescent genitalia trauma: a retrospective analysis of the National Trauma Data Bank. Pediatr Surg Int. 2020 Oct;36(10):1235-1241.

[14] Adams JA. Understanding Medical Findings in Child Sexual Abuse: An Update For 2018. Acad Forensic Pathol. 2018 Dec;8(4):924-937 (Citing McCann, J, Voris J, Simon M, Wells R. Perianal findings in prepubertal children selected for nonabuse: a descriptive study. Child Abuse Negl. 1989 Jan; 13(2):179-93; Myhre AK, Adams JA, Kaufhold M, et al. Anal findings in children with and without probable anal penetration: a retrospective study of 1115 children referred for suspected sexual abuse. Child Abuse Negl. 2013 Jul; 37(7):465-74; Myhre AK, Berntzen K, Bratlid D. Perianal anatomy in non-abused preschool children. Acta Paediatr. 2001 Nov; 90(11):1321-8.

[15] Adams JA. Understanding Medical Findings in Child Sexual Abuse: An Update For 2018. Acad Forensic Pathol. 2018 Dec;8(4):924-937; Sgroi, S. M. (1982). Handbook of clinical intervention in child sexual abuse. Lexington, MA: Lexington Books, D. C. Heath and Co.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

    d.   In the absence of acute injury and in light of delayed disclosures, the retrospective interpretation of healed trauma presents the greatest diagnostic challenge for the physician.[16]

93.    In addition, studies have shown that sexually transmitted diseases are rarely discovered in pediatric forensic medical examinations.[17]

94.    "Only the recovery of the assailant's bodily fluids in or on a child's body, or pregnancy is conclusive of previous sexual contact…For the majority of sexually abused children and adolescents, the medical examination will not reveal any signs of injury or infection. The detail, clarity, and consistency of the child's description of what happened to them is the most important factor in determining if sexual abuse occurred"[18]

95.    "At this time, forensic evidence collection is recommended for sexual contact that may have resulted in the exchange of biologic material within 24 hours in prepubertal children and within 72 hours in adolescents."[19]

---

[16] Finkel, M. A. (1989a). Child sexual abuse: A physicians introduction to historical and medical validation. Journal of the American Osteopathic Association, 89, 1143–1149; Finkel, M. A., (1989b). Anogenital trauma in sexually abused children. Pediatrics, 84, 317–322; McCann, J., Voris, J., & Simon, M. (1992). Genital injuries resulting from sexual abuse: A longitudinal study. Pediatrics, 89, 307–317.

[17] Adams JA, Farst KJ, Kellogg ND. Interpretation of Medical Findings in Suspected Child Sexual Abuse: An Update for 2018. J Pediatr Adolesc Gynecol. 2018 Jun;31(3):225-231; Erratum in: J Pediatr Adolesc Gynecol. 2018 Dec;31(6):655; Kellogg, N. D., Melville, J. D., Lukefahr, J. L., Nienow, S. M., & Russell, E. L. (2018). Genital and Extragenital gonorrhea and Chlamydia in children and adolescents evaluated for sexual abuse. Pediatric Emergency Care, 34(11), 761–766.

[18] Adams JA. Understanding Medical Findings in Child Sexual Abuse: An Update For 2018. Acad Forensic Pathol. 2018 Dec;8(4):924-937.

[19] Adams JA, Kellogg ND, Farst KJ, Harper NS, Palusci VJ, Frasier LD, Levitt CJ, Shapiro RA, Moles RL, Starling SP. Updated Guidelines for the Medical Assessment and Care of Children Who May Have Been Sexually Abused. J Pediatr Adolesc Gynecol. 2016 Apr;29(2):81-87. (Citing Christian CW: Timing of the medical examination. J Child Sex Abuse 2011; 20: 505.)

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

    a.   Children who are seen within 7 days of the alleged incident are more likely to have positive findings[20] and therefore best practice must ensure medical examination occurs as soon as possible after the alleged incident.

    b.   In children who were assessed long after the alleged incidents, findings consistent with previous trauma occurred only in four out of 192 cases.[21]

    c.   Another study reported normal examinations in 96.3% of children referred for sexual abuse examinations.[22]

    d.   Anogenital injuries in children heal fast because of a good blood supply.[23]

    e.   Most anogenital injuries heal without residual damage, and this holds true for perianal injuries, hymenal and non-hymenal injuries.[24]

96.    Child abuse specialists are trained that because "a majority of sexual abuse victims have normal genital examinations,[25] a common theme in [expert witness] testimony

---

[20] Watkeys JM, Price LD, Upton PM, Maddocks A. The timing of medical examination following and allegation of sexual abuse: is this an emergency? Arch Dis Child. 2008; 93:851-856.

[21] Berenson AB, Chacko MR, Wiemann CM, et al: A case-control study of anatomic changes resulting from sexual abuse. Am J Obstet Gynecol 2000; 182:820. discussion 831.

[22] Heger A, Ticson L, Velasquez O, Bernier R. Children referred for possible sexual abuse: Medical findings in 2384 children. Child Abuse Negl. 2002;26(6–7): 645–659.

[23] Finkel MA. Children's disclosures of child sexual abuse. Pediatr Ann. 2012;41(12): 262–e267; McCann J, Voris J. Perianal injuries resulting from sexual abuse: A longitudinal study. Pediatrics. 1993;91(2):390–397; The Child Abuse Atlas. 2014 [cited 2018 Sep 17].

[24] Heppenstall-Heger A, McConnell G, Ticson L, Guerra L, Lister J, Zaragoza T. Healing patterns in anogenital injuries: A longitudinal study of injuries associated with sexual abuse, accidental injuries, or genital surgery in the preadolescent child. Pediatrics. 2003;112(4):829–837; McCann J, Voris J. Perianal injuries resulting from sexual abuse: A longitudinal study. Pediatrics. 1993;91(2):390–397; McCann J, Miyamoto S, Boyle C, Rogers K. Healing of hymenal injuries in prepubertal and adolescent girls: A descriptive study. Pediatrics. 2007;119(5): e1094–e1106.

[25] Berenson AB, Chacko MR, Wiemann CM, et al: A case-control study of anatomic changes resulting from sexual abuse. Am J Obstet Gynecol 2000; 182:820. discussion 831; Adams JA, Harper K, Knudson S, et al: Examination findings in legally confirmed child sexual abuse: it's normal to be normal. Pediatrics 1994; 94:310.

is the explanation of the findings and that a physical examination alone does not prove or disprove that sexual abuse occurred."[26]

97.    Studies show the legal resolution of a sexual assault case is not dependent upon evidence of physical injury found during a forensic medical examination.[27]

**b.    Pediatric genitourinary exams are unnecessary medical procedures when sexual abuse is not suspected.**

98.    Keeping in mind that physical medical evidence is rarely found in acute cases of sexual abuse, and that even less evidence is found in nonacute cases of sexual abuse, genitourinary exams of children who are not suspected of sexual abuse are unnecessary, intrusive, and traumatic for the children involved.

99.    Studies show forensic medical examinations that include genitourinary exams can be traumatic for the patient, "reinforcing feelings of powerlessness, shame and

[26] Adams JA, Kellogg ND, Farst KJ, Harper NS, Palusci VJ, Frasier LD, Levitt CJ, Shapiro RA, Moles RL, Starling SP. Updated Guidelines for the Medical Assessment and Care of Children Who May Have Been Sexually Abused. J Pediatr Adolesc Gynecol. 2016 Apr;29(2):81-87 (Citing Christian CW: Timing of the medical examination. J Child Sex Abuse 2011; 20: 505.)

[27] Wiley J, Sugar N, Fine D and Eckert LO: Legal outcomes of sexual assault. Am J Obstet Gynecol 188(6): 1638-1641, 2003; Mont JD and Parnis D: The uses and impacts of medico-legal evidence in sexual assault cases: A global review, 2007; Lawson L. Preparing sexually abused girls for genital evaluation. Issues Comprehens Pediatr Nurs 1990; 13: 155-64; Henry J. System intervention trauma in child sexual abuse victims following disclosure. J Interpersonal Violence 1997; 12: 499-512; Lazebnik R, Zimet GD, Ebert J et al. How children perceive the medical evaluation for suspected sexual abuse. Child Abuse Negl 1994; 18: 739-45; Steward MS, Schmitz M, Steward DS et al. Children's anticipation of and response to colposcopic examination. Child Abuse Negl 1995; 19: 997-1005; Henry J. System intervention trauma in child sexual abuse victims following disclosure. J Interpersonal Violence 1997; 12: 499-512; Berson NL, Herman-Giddens ME, Frothingham TE. Children's perceptions of genital examinations during sexual abuse evaluations. Child Welfare 1993; 72: 41-9; Prior V, Glaser D, Lynch MA. Messages from children: Children's evaluations of the professional response to child sexual abuse. London: NCH Action for Children; 1994; Martin MJ. Child sexual abuse: Preventing continued victimization by the criminal justice process and associated agencies. Fam Relations 1992; 6: 330-4; Lynch L, Faust J. Reduction of distress in children undergoing sexual abuse medical evaluations. J Pediatr 1998; 133: 296-99.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

guilt".[28] Children's negative comments about the medical examination highlighted a perceived lack of choice and a lack of realistic preparation. Other studies have shown that forensic medical examinations that include genitourinary exams for a small, but significant minority of children, is at least moderately traumatic, making it necessary to develop and evaluate strategies to minimize this trauma.[29]

100.    Studies of healthcare professionals "stressed the significance of patient consent and choice when interacting with any patient whether they have a history of sexual assault or not, as these deliberate acts could inflict harm and create a culture of distrust"[30]

101.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. regularly conduct pediatric genitourinary exams allegations of abuse, neglect, excessive corporal punishment, and even poverty, such as when a parent is alleged to have:

    a.    Used excessive corporal punishment;
    b.    Had electricity or water turned off at their residence;
    c.    Been homeless;
    d.    Tested positive for marijuana or any other controlled substance;

---

[28] Campbell R, Dworkin E and Cabral G: An ecological model of the impact of sexual assault on women's mental health. Trauma Violence Abuse 10(3): 225-246, 2009; Du Mont J, White D and McGregor MJ: Investigating the medical forensic examination from the perspectives of sexually assaulted women. Soc Sci Med 68(4): 774-780, 2009.; Campbell R and Raja S: Secondary victimization of rape victims: insights from mental health professionals who treat survivors of violence. Violence Vict 14(3): 261-275, 1999.

[29] Peterson, L., & Brownley-Duffeck, M. (1984). Prevention of anxiety and pain due to medical and dental procedures. In M. C. Roberts & L. Peterson. (Eds.), Prevention of problems in childhood: Psychology research and applications (pp. 266–308). New York: Wiley; Rasnake, L. K., & Linscheid, T. R. (1989). Anxiety reduction in children receiving medical care: Developmental considerations. Journal of Developmental & Behavioral Pediatrics, 10, 169–175.

[30] DeMaria AL, Meier S, King H, Sidorowicz H, Seigfried-Spellar KC, Schwab-Reese LM. The role of community healthcare professionals in discussing sexual assault experiences during obstetrics and gynecological healthcare appointments. BMC Womens Health. 2023 May 15;23(1):263.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

e.    Been accused of criminal domestic violence
f.    Truancy;
g.    Missed doctor's appointments;
h.    Unsatisfactorily explanation of a child's injury
i.    Been accused of emotional abuse;
j.    Been accused of physical neglect; and/or
k.    Been accused of physical abuse;

102.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. regularly conduct pediatric genitourinary exams when there is no indication or suspicion of sexual abuse.

103.    When children receive unnecessary genitourinary exams by Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., their parents or caregivers are not allowed to attend because they are either suspected of physical abuse or neglect of their child(ren) or they are alleged to have allowed their partner to physically abuse or neglect their child(ren).

104.    These unnecessary pediatric genitourinary exams are conducted at the explicit request of the South Carolina Department of Social Services, which is fishing for evidence outside of the scope of allegations of neglect or physical abuse.

105.    The Plaintiffs assert that these unnecessary pediatric genitourinary exams are intrusive and mentally and emotionally harmful.

106.    Due to the statistically insignificant chance of finding physical evidence of sexual abuse, there is no medical necessity in conducting intrusive pediatric genitourinary exams upon children who are not suspected victims of sexual abuse.

107.    By conducting unnecessary pediatric genitourinary exams upon children who are not suspected victims of sexual abuse, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. violated the standard of care for physicians, physician associates, and nurses. See Exhibit 1.

108.    Children who refuse pediatric genitourinary exams are bullied, pressured, and intimidated to undergo unnecessary pediatric genitourinary examinations by Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. and their staff.

      a.    Research shows that if a child refuses an examination in a case where there are no medical indications for clinical examination, the reluctance of the child should be respected to avoid secondary traumatization.[31]

109.    By bullying, pressuring, and intimidating children to undergo unnecessary pediatric genitourinary examinations, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. violated the standard of care for physicians, physician associates, and nurses.

      **c.    Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, and Jennifer Leigh Sabo, M.D. are state actors.**

---

[31] Heppenstall-Heger A, McConnell G, Ticson L, Guerra L, Lister J, Zaragoza T. Healing patterns in anogenital injuries: A longitudinal study of injuries associated with sexual abuse, accidental injuries, or genital surgery in the preadolescent child. Pediatrics. 2003;112(4):829–837.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

110.    It is South Carolina Department of Social Services who refers almost all children to Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. for forensic medical examinations for neglect and physical abuse.

111.    In each instance where Plaintiff Children were seen by Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., there were no allegations, or even suspicions, of sexual abuse in South Carolina Department of Social Services' investigation.

112.    Plaintiff Children, and other children involved in child abuse and neglect investigations were/are not allowed to see a medical provider other than Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. and they were not allowed to see a medical provider of their choosing.

113.    Almost all referrals for forensic medical exams to Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., including the referrals of the Plaintiff Children, were/are made by South Carolina Department of Social Services to obtain evidence of child abuse and neglect for use in legal proceedings.

114.    "A private party also "may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019) (citing

*West v. Atkins*, 487 U.S. 42, 56 (1988)).

     115.    The "Consent for Medical Diagnosis and Treatment", is given to the

Children's parents or caregivers before the exam by Caseworkers for the South Carolina

Department of Social Services. No members of the Children's Advocacy Centers, such as

Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D.,

Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and

Susan Michelle Lamb, M.D., are present to explain the procedures or obtain informed

consent. A screenshot of the consent form is provided below:



     116.    In the consent form, there is no mention that intrusive and unnecessary

pediatric genitourinary examinations would be conducted on the Plaintiff Children or that

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

there was limited medical and forensic value in conducting pediatric genitourinary examinations when there are no suspicions of sexual abuse.

117.    Photos were taken of the Plaintiff Children's genitalia even when no significant findings were found.

118.    The subject of the consent form focuses completely on the forensic and legal nature of the medical procedures and not on the need for diagnosis and future treatment. This shows that Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are conducting these procedures as state actors on behalf of the State of South Carolina.

119.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. knowingly do not explain the medical procedures to either the Children undergoing these intrusive forensic medical examinations or the Children's parents and caregivers.

120.    Plaintiffs assert, without qualification, that forensic medical exams at Children's Advocacy Centers are a search for evidence and implicate protections under S.C. Const. art. I, § 10 and S.C. Const. art. I, § 3 and Amendments IV and XIV of the United States Constitution.

121.    Policies and procedures regarding the provision of specific services of forensic medical exams at Children's Advocacy Centers are controlled by the State of South Carolina. *See*, S.C. Code Ann. 63-11-310, et seq., S.C. Code Ann. § 63-11-430, et seq., S.C. Code Ann. 63-11-2400, et seq.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

122.     Caseworkers for the South Carolina Department of Social Services fill out the applications for forensic medical examinations and schedule the appointments for the forensic medical examinations.

123.     Because caseworkers for the South Carolina Department of Social Services do not allow children's parents and caregivers to attend the forensic medical exam, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are given little to no medical and social history of the child. This demonstrates that the exams are solely for evidence gathering and not for the medical wellness of the children.

124.     Caseworkers for the South Carolina Department of Social Services attend the forensic interviews and the forensic examinations of children at Children's Advocacy Centers.

125.     The standard of care for physicians, physician associates, and nurses allows children or a parent to stop a pediatric genitourinary examination before, during, or at any time during the examination. Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. do not allow children or parents to stop the examination, as each of the Plaintiff Children experienced.

126.     Copies of the Plaintiff Children's medical records from CACs and Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. are not available to the Plaintiff Children, their parents, or

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

caregivers. The Plaintiff Children's attorneys cannot obtain their own client's records without a court order while S.C. Code Ann. § 63-11-310(B)(3) requires that these records "must be released to the Department of Social Services" and law enforcement.

### IV.    Class Allegations.

127.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

128.    This action is properly maintained as a class action pursuant to Rule 23, SCRCP.

129.    The general Class is defined as all children who are or will be referred to Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. by SCDSS pursuant to allegation of abuse and/or neglect, excepting any allegations or suspicions of sexual abuse.

130.    The Putative Class is sufficiently numerous to make joinder impracticable. In 2022, 3,953 children were provided forensic medical examinations.[32] In 2022, 61.9% of all referrals for forensic medical evaluations were referred by SCDSS, 39.6% were referred by law enforcement, 11.6% were referred by a healthcare provider, and 4.9% were provided by

---

[32] South Carolina Children's Advocacy Medical Response System Annual Report for 2022.

other sources.[33] Sexual abuse was the primary maltreatment concern,[34] making up 49% of all referrals, with 46% for physical abuse, 20% for neglect, and 7% for other.[35]

131.    Of the 17 primary Children's Advocacy Centers in South Carolina, Defendant Prisma Health Medical Group conducts forensic medical exams for 9 of them – Midlands Family and Child Advocacy Clinic in Columbia, South Carolina; Metropolitan Child Advocacy Center in Columbia, South Carolina; Child Advocacy Center of Aiken County in Aiken, South Carolina; Edisto Child Advocacy Center in Orangeburg, South Carolina; Safe Passage Child Advocacy Center in Rock Hill, South Carolina; The Julie Valentine Center in Greenville, South Carolina; Beyond Abuse in Greenwood, South Carolina; First Light in Anderson, South Carolina; Spartanburg Alliance, in Spartanburg, South Carolina.

132.    The questions of fact and law raised by the Named Plaintiffs claims are common to and typical of those of each putative member of the Class whom they seek to represent, because each Named Plaintiffs and putative Class member is a minor child who has been (1) the subject of an investigation for child abuse and/or neglect and been forced to undergo unnecessary and intrusive pediatric genitourinary examinations and by virtue of their minority, are subject to an investigation for child abuse and/or neglect and forced to undergo unnecessary and intrusive pediatric genitourinary examinations, subjecting the Named Plaintiffs to significant known harms and/or the imminent risk of known harms as a

---

[33] South Carolina Children's Advocacy Medical Response System Annual Report for 2022.
[34] Some Children were referred for multiple maltreatment concerns.
[35] "Other" includes "Abduction/kidnapping, Brief Resolved Unexplained Event (BRUE), Death of a sibling or another child in household due to abuse/neglect, Emotional Abuse, Medical Child Abuse/Fabricated or Induced Illness (formerly known as Munchausen Syndrome by Proxy), Witness to Abuse/ Violence or Exploitation into Pornography".

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

direct result of the continuous and systematic use of unnecessary and intrusive pediatric genitourinary examinations for evidence collection by Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D.

133.    At a minimum, the issues raised by Plaintiffs are capable of repetition but evading review. *Byrd v. Irmo High School*, 321 S.C. 426, 468 S.E.2d 861 (1996) (when the issue raised was "capable of repetition but evading review, thereby no longer requiring courts to make a finding concerning the reasonable expectation that the same complaining party would be subjected to the action again".). *See also*, *State v. Passmore*, 363 S.C. 568, 611 S.E.2d 273 (Ct. App. 2005); *Sloan v. Greenville Cnty.*, 356 S.C. 525, 531, 590 S.E.2d 36, 38 (Ct. App. 2003) ("The party bringing the action need only show the issue raised is capable of repetition and is not required to prove there is a 'reasonable expectation the issue will arise again.'").

134.    Defendants have acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.

135.    Questions of fact common to the Class include:

a.    Whether Defendants, through their actions, have a pattern, custom and/or practice of conducting unnecessary and intrusive pediatric genitourinary examinations on Plaintiff Children when there are no allegations, or even suspicions, of sexual abuse.

136.    Questions of law common to the Class include:

a.    Whether Defendants, through their actions, have a pattern, custom and/or practice of conducting unnecessary and intrusive pediatric

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

genitourinary examinations when there are no allegations, or even
suspicions, of sexual abuse violate Plaintiff Children's rights to
privacy, substantive due process rights, and procedural due process
rights.

137.    Named Plaintiffs will fairly and adequately protect the interests of the Class
and Subclasses that they seek to represent.

138.    The violations of law and resulting harms averred by Named Plaintiffs are
typical of the legal violations and harms and/or imminent risks of harms experienced by all
Plaintiff Children in the Class.

139.    Each Named Plaintiffs appear by a Next Friend pursuant to Rule 17(a),
SCRCP and each Next Friend is sufficiently familiar with the facts of the child's situation
and dedicated to the child's best interests to fairly and adequately represent the child's best
interests in this litigation.

140.    Plaintiff Children in the Class and Subclasses are represented by the
undersigned attorneys who are competent and experienced in child welfare litigation and
complex civil litigation in state and federal court in South Carolina.

## V.    Claims.

### FOR A FIRST CAUSE OF ACTION
### Privacy/Search and Seizure (Injunctive Relief Pursuant to S.C. Const. art. I, § 10)

141.    Plaintiffs incorporate by reference the foregoing paragraphs of this
Complaint as though fully set forth herein.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

142.    The South Carolina Constitution guarantees that "[t]he right of the people to be secure in their persons . . . [against] unreasonable invasions of privacy shall not be violated." S.C. Const. art. I, § 10.

143.    This guarantee is broad and encompasses "the full panoply of privacy rights Americans have come to enjoy over the history of our Nation." *Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 249-250, 882 S.E.2d 770, 808-809 (2023*), reh'g denied* (Feb. 8, 2023) (Few, J., concurring in the judgment)

144.    The South Carolina Supreme Court has recognized that this right to privacy includes the right to make choices about one's medical care and to preserve one's bodily integrity. *See Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993); *Hughes v. State*, 367 S.C. 389, 398 n.2, 626 S.E.2d 805, 810 n.2 (2006).

145.    By forcing children who are suspected of being abused or neglected to undergo unnecessary pediatric genitourinary examinations Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. violated Plaintiffs' patients' right to privacy.

146.    The foregoing policies and practices of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., who directly and indirectly control and are responsible for the policies and practices of Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm and risks of harm all Plaintiff Children in the Class, which is a substantial

ELECTRONICALLY FILED - 2024 May 15 12:12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all Plaintiff Children

147.    The foregoing actions and inactions of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of all Plaintiff Children in the Class, such that Defendants were plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the conscience. As a result, all Named Plaintiffs and Plaintiff Children have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by S.C. Const. art. I, § 10.

148.    Plaintiffs ask the Court to issue injunctive relief pursuant to South Carolina's Uniform Declaratory Judgments Act, S.C. Code Ann. § 15-53-20, which states:

> Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect. Such declarations shall have the force and effect of a final judgment or decree.

S.C. Code Ann. § 15-53-20.

**SECOND CAUSE OF ACTION**
**Procedural and Substantive Due Process**
**(Injunctive Relief Pursuant to S.C. Const. art. I, § 3)**

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

149.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

150.    The South Carolina Constitution's Due Process Clause states that no person "shall . . . be deprived of life, liberty, or property without due process of law." S.C. Const. art. I, § 3.

151.    By forcing children who are suspected of being abused or neglected, but not sexually abused, to undergo unnecessary pediatric genitourinary examinations, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. violated Plaintiffs' patients' procedural and substantive due process rights to life and liberty, as guaranteed by article I, section 3 of the South Carolina Constitution.

152.    The Due Process Clause's protection of individual liberty encompasses a person's right to make decisions regarding unnecessary medical procedures, free from unwarranted State intrusions. The parents' and caregivers' parental rights were not limited or removed in any manner before, during, or after these unnecessary medical procedures.

153.    In addition to the right to privacy under article I, section 10, South Carolinians possess liberty and privacy interests under article I, section 3. This includes the freedom and privacy to make decisions about their lives and health.

154.    The forced unnecessary pediatric genitourinary examinations infringe on this fundamental procedural and substantive due process right without adequate justification.

155.    The foregoing policies and practices of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., who directly and indirectly control and are responsible for the policies and practices of Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm and risks of harm all Plaintiff Children in the Class, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all Plaintiff Children

156.    The foregoing actions and inactions of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of all Plaintiff Children in the Class, such that Defendants were plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the conscience. As a result, all Named Plaintiffs and Plaintiff Children have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by S.C. Const. art. I, § 3.

157.    Plaintiffs ask the Court to issue injunctive relief pursuant to South Carolina's Uniform Declaratory Judgments Act, S.C. Code Ann. § 15-53-20, which states:

> Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The

declaration may be either affirmative or negative in form and effect. Such
declarations shall have the force and effect of a final judgment or decree.

S.C. Code Ann. § 15-53-20.

## THIRD CAUSE OF ACTION
### Privacy/Search and Seizure/Procedural and Substantive Due Process
### (Injunctive Relief Pursuant to 42 U.S.C. §1983)

158.    Plaintiffs incorporate by reference the foregoing paragraphs of this
Complaint as though fully set forth herein.

159.    Under 42 U.S.C. § 1983, persons and agencies acting under color of state law
are liable for violating constitutional rights

160.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic,
Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria
Young, M.D., and Susan Michelle Lamb, M.D. have stepped into the shoes of the state in
performing unnecessary and intrusive pediatric genitourinary examinations in a search of
evidence of sexual abuse when there is no allegation, or even suspicion, of sexual abuse.

161.    The only entities who are allowed to submit referrals for forensic medical
examinations are the South Carolina Department of Social Services, law enforcement, and
physicians, with almost all referrals made by the South Carolina Department of Social
Services.

162.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic,
Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria
Young, M.D., and Susan Michelle Lamb, M.D. do not explain the procedures to the Plaintiff
Children or their parents or caregivers to allow informed consent. In most cases, as in the
case of Plaintiff Jane Doe, the parents are not allowed to be present or bring their child to
the examination.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

163.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. know that there is little to no utility in conducting pediatric genitourinary examinations when there are no allegations or even suspicions of sexual abuse.

164.    The foregoing policies and practices of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., who directly and indirectly control and are responsible for the policies and practices of Defendants Prisma Health Medical Group, Midlands Family and Child Advocacy Clinic, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm and risks of harm all Plaintiff Children in the Class, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all Plaintiff Children

165.    The foregoing actions and inactions of the Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D., constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of all Plaintiff Children in the Class, such that Defendants were plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice,

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

which shocks the conscience. As a result, all Named Plaintiffs and Plaintiff Children have been harmed or are at continuing and imminent risk of harm and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

166.    These substantive due process rights include, but are not limited to: the right to protection from unnecessary physical, emotional or psychological harm and to be reasonably free from harm.

167.    By forcing children who are suspected of being abused or neglected to undergo unnecessary and intrusive pediatric genitourinary examinations, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. have violated the Plaintiff Children's First, Fourth, Fifth, Sixth, and Fourteenth Amendment Rights of the United States Constitution.

168.    This violation of Plaintiffs' constitutional rights Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. can be remedied by an Order of this Court restraining them from further harming other children, or even the Plaintiff Children, should they be sent for another forensic examination.

169.    Plaintiffs ask the Court to issue such an Order and to make the order applicable to similarly situated children and parents in this state.

170.    Plaintiffs seek attorney's fees and costs.

**FOURTH CAUSE OF ACTION**
**Procedural and Substantive Due Process**

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

**(Violation of Plaintiffs' Fourteenth Amendment Rights - 42 U.S.C. §1983)**

171.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

172.    Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H. have a constitutional right to be free from unnecessary search and seizure and unnecessary medical procedures.

173.    Under 42 U.S.C. § 1983, persons and agencies acting under color of state law are liable for violating constitutional rights.

174.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. have stepped into the shoes of the state in performing unnecessary and intrusive pediatric genitourinary examinations in a search of evidence of sexual abuse when there is no allegation, or even suspicion, of sexual abuse.

175.    The only entities who are allowed to submit referrals for forensic medical examinations are the South Carolina Department of Social Services, law enforcement, and physicians, with almost all referrals made by are the South Carolina Department of Social Services.

176.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. do not explain the procedures to the Plaintiff Children or their parents or caregivers to allow informed consent.

177.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. know that there is little to no utility in

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

conducting pediatric genitourinary examinations when there are no allegations or even suspicions of sexual abuse.

178.    By forcing children who are suspected of being abused or neglected to undergo unnecessary and intrusive pediatric genitourinary examinations, Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. have violated the Plaintiff Children's First, Fourth, Fifth, Sixth, and Fourteenth Amendment Rights of the United States Constitution.

179.    These acts were in violation of the Jane Doe, M.F., B.D.H., B.J.H., and W.H.'s Constitutional Rights to be free from unnecessary search and seizure and deprived of due process of law as incorporated by the Fourteenth Amendment of the United States Constitution.

180.    Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H. were incapable of defending themselves or sufficiently resisting due to the apparent authority of Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D.

181.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. were without any authority to conduct unnecessary and intrusive pediatric genitourinary examinations on Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

182.    Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. were without any authority to subject Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H. to such degrading acts.

183.    The acts of Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. were the proximate cause of the violation of the Plaintiffs' Constitutional Rights and the damages – degradation, physical harm, emotional harm, and future emotional harm – suffered by Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H.

184.    Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H. suffered damages, as a result of the acts of Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D.'s violation of the Plaintiff Children's Constitutional Rights.

185.    Plaintiffs Jane Doe, M.F., B.D.H., B.J.H., and W.H. ask the Court to award damages, punitive damages, and costs of this action.

WHEREFORE, Plaintiffs ask the Court to grant the following relief:

A.    Damages and special damages in the appropriate amount;

B.    Punitive damages as are appropriate and when allowed by statute or the common law;

C.    Attorneys' fees, costs, expenses, and disbursements of this action when allowed by statute or the common law;

D.  Declare unconstitutional Defendant's illegal searches and seizures by conducting unnecessary and intrusive pediatric genitourinary examinations no allegations or suspicions of sexual abuse are present.

E.  Injunctive relief ordering Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. to cease conducting unnecessary and intrusive pediatric genitourinary examinations on children unless there is probable cause, or even a suspicion, of sexual abuse;

F.  Injunctive relief ordering Defendants Prisma Health, Midlands Family and Child Advocacy Clinic, Olga Rosa, M.D., Shelby Brady, FNP-C, Jennifer Leigh Sabo, M.D., Ladonna Alexandria Young, M.D., and Susan Michelle Lamb, M.D. to provide the Court with a policy that delineates when privacy and Constitutional protections may be abrogated and the extent to which pediatric genitourinary examinations may be conducted due to probable cause, or even a suspicion, of sexual abuse is present.

G.  Interest; and

H.  Such other and further relief as is just and proper.

Respectfully Submitted,

s/Robert J. Butcher
Robert J. Butcher
Federal Bar No. 9767
Deborah J. Butcher
Federal Bar No. 10731
The Foster Care Abuse Law Firm, PA
507 Walnut Street

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone: (803) 432-7599
Facsimile: (803) 432-7499
Email: rbutcher@camdensc-law.com
Email: dbutcher@camdensc-law.com

Camden, South Carolina
May 15, 2024

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

# EXHIBIT 1

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

## AFFADAVIT OF KATE WISE, DNP, FNP-BC

1. My name is Kate Wise, DNP, FNP-BC, and I am over the age of 18 and fully competent to testify as to the matters herein. I have been actively engaged in the practice of nursing for 17 years, including the timeframes of concern for these matters. I have specialized in pediatric critical care and pediatric specialty care for the entirety of my nursing career. I am also a faculty member for RN students in their pediatric clinical courses. My qualifications are outlined in the attached curriculum vitae and made a part hereof. I am familiar with the standard of care as it pertains to management in situations such as those that unfolded in this case.

2. I have reviewed the medical records for N.F. and M.F. as follows:

    a. Prisma Health for M.F.-03/14/2023
    b. Prisma Health for N.F.-03/14/2023
    c. Palmetto Pediatrics for M.F.-11/29/2012 to 07/12/2023
    d. Palmetto Pediatrics for N.F.-09/12/2018 to 07/12/2023
    e. Dr. Boland and Associates for M.F.-07/31/2023 to 10/18/2023
    f. Dr. Boland and Associates for N.F.-08/17/2023 to 10/25/2023

3. On the date of 03/14/2023, M.F. and N.F. were seen and evaluated at the Midlands Family and Child Advocacy clinic. At this time, the children were evaluated for concerns of neglect and threat of harm. When interviewed, both children denied any instances of sexual abuse in the home.

4. While being evaluated at the Midlands Family and Child Advocacy Center, both M.F. and N.F. informed the medical examiner that they did not want a forensic medical exam. Consent by Loretta Farmer, the patients' adoptive mother, was not obtained for these exams.

5. During the forensic medical exams, M.F. and N.F. were instructed to remove their clothing, and an invasive forensic medical examination utilizing a colposcope was performed on each child. Each child requested that the exam be discontinued; this was not done.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

6. The standard of care (SOC) for the pediatric genitourinary exam is that invasive exams should be performed only when absolutely necessary. The SOC dictates that an adolescent should be permitted to have a parent in the room at the time of the exam. The exam should be explained in detail to the patient, and consent should be obtained. The SOC further delineates that, if a child does not want to cooperate, the exam should be postponed in order to prevent unnecessary trauma for the patient. Furthermore, an invasive vaginal exam, particularly in a patient in whom sexual abuse is suspected, may be performed under general anesthesia as the least traumatic method for examination; this exam should be done by an experienced gynecologist. Pediatric patients should also be allowed to remain as clothed as possible for the exam, with only the necessary parts of the body exposed at the time of the practitioner's examination.

7. Based on my review of the above records, it is my opinion that, within a reasonable degree of medical probability, the standard of care for a pediatric genitourinary exam was significantly breached in the cases of both N.F. and M.F. These minors were not informed that an invasive genital exam would be performed on their vaginas, and they were told the exam was to evaluate for bodily bruising. Consent was not obtained from either patient. The children were forced to fully disrobe. The patients denied any instances of sexual abuse, but invasive exams were completed anyway. The legal parent did not consent to these exams. The legal parent was not allowed to remain with the children for these invasive exams. Both N.F. and M.F. requested that the exam be stopped, and the exam was not discontinued for either child. A deviation from the standard of care for the ethical pediatric GU exam can result in significant trauma to the pediatric patient. It is my opinion that the SOC was violated and resulted in trauma for both N.F. and M.F. on the date of 03/14/2023.

8. My opinion has never been disqualified in any court.

9. I certify that I have not been found guilty of fraud or perjury in any jurisdiction.

10. Under penalties of perjury, I certify that I have read the foregoing and that the facts stated in it are true.

*Signature page to follow*



Kate H Wise, DNP, FNP-BC

The foregoing instrument was acknowledged before me this 26 day of April, 2024, by

Kate Wise .

Signature of Notary

Tiffany M Taylor

Name of Notary (typed or stamped)

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

## AFFIDAVIT OF KATE WISE, DNP, FNP-BC

1. My name is Kate Wise, DNP, FNP-BC, and I am over the age of 18 and fully competent to testify as to the matters herein. I have been actively engaged in the practice of nursing for 17 years, including the timeframes of concern for these matters. I have specialized in pediatric critical care and pediatric specialty care for the entirety of my nursing career. I am also a faculty member for RN students in their pediatric clinical courses. My qualifications are outlined in the attached curriculum vitae and made a part hereof. I am familiar with the standard of care as it pertains to management in situations such as those that unfolded in this case.

2. I have reviewed the medical records for Jane Doe to include:

   a. Metropolitan Children's Advocacy Center-05/17/2021
   b. South Carolina Network for Children's Advocacy Centers-06/03/2021
   c. Midlands Family and Child Advocacy Clinic-07/06/2021
   d. Prisma Health Records-01/28/2022

3. On the date of 07/06/2021, Jane Doe was seen and evaluated at the Midlands Family and Child Advocacy clinic. At this time, the child was evaluated for concerns of emotional neglect, physical neglect, and physical abuse. There were no allegations of any sexual abuse. When interviewed, the child denied any instances of sexual abuse in the home.

4. While being evaluated at the Midlands Family and Child Advocacy Center, Jane Doe's mother was asked to leave the building at the time of the exam. Consent by N.O., the patient's mother, was not obtained for these exams. The patient's stepfather signed for the exam; however, he did not have legal custody of the child. The child did not consent to the exam.

5. During the forensic medical exams, Jane Doe was instructed to remove her clothing, and an invasive forensic medical examination utilizing a colposcope was performed on the child. The child expressed discomfort and requested that the exam be discontinued; this was not done.

6. The standard of care (SOC) for the pediatric genitourinary exam is that invasive exams should be performed only when absolutely necessary. The SOC dictates that an adolescent should be permitted to have a parent in the room at the time of the exam.

1

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

The exam should be explained in detail to the patient, and consent should be obtained. The SOC further delineates that, if a child does not want to cooperate, the exam should be postponed in order to prevent unnecessary trauma for the patient. Furthermore, an invasive vaginal exam, particularly in a patient in whom sexual abuse is suspected, may be performed under general anesthesia as the least traumatic method for examination; this exam should be done by an experienced gynecologist. Pediatric patients should also be allowed to remain as clothed as possible for the exam, with only the necessary parts of the body exposed at the time of the practitioner's examination.

7. Based on my review of the above records, it is my opinion that, within a reasonable degree of medical probability, the standard of care for a pediatric genitourinary exam was significantly breached in the case of Jane Doe. This minor child was not informed that an invasive genital exam would be performed on her vagina, and she and her mother were told the exam was to evaluate for bodily bruising. Consent was not obtained from the patient. The child was forced to fully disrobe. The patient denied any instances of sexual abuse, but an invasive exam was completed anyway. The legal parent did not consent to this exam. The legal parent was not allowed to remain with the child for this invasive exam. Jane Doe requested that the exam be stopped due to her discomfort, and the exam was not discontinued. A deviation from the standard of care for the ethical pediatric GU exam can result in significant trauma to the pediatric patient. It is my opinion that the SOC was violated and resulted in trauma for Jane Doe on the date of 07/06/2021.

8. My opinion has never been disqualified in any court.

9. I certify that I have not been found guilty of fraud or perjury in any jurisdiction.

10. Under penalties of perjury, I certify that I have read the foregoing and that the facts stated in it are true.

***Signature Page Follows***

2

Kate H Wise, DNP, FNP-BC

The foregoing instrument was acknowledged before me this _26_ day of April, 2024, by

Kate Wise .

Signature of Notary

Tiffany M Taylor

Name of Notary (typed or stamped)

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

## AFFADAVIT OF KATE WISE, DNP, FNP-BC

1.  My name is Kate Wise, DNP, FNP-BC, and I am over the age of 18 and fully competent to testify as to the matters herein. I have been actively engaged in the practice of nursing for 17 years, including the timeframes of concern for these matters. I have specialized in pediatric critical care and pediatric specialty care for the entirety of my nursing career. I am also a faculty member for RN students in their pediatric clinical courses. My qualifications are outlined in the attached curriculum vitae and made a part hereof. I am familiar with the standard of care as it pertains to management in situations such as those that unfolded in this case.

2.  I have reviewed the medical records for B.D.H, B.J.H., and W.H. as follows:
    a.  Rock Hill Pediatrics: 10/17/2012-11/27/2020
    b.  Prisma Midlands Family and Child Advocacy clinic: 05/24/2021

3.  On the date of 05/24/2021, B.D.H., B.J.H., and W.H. were seen and evaluated at the Midlands Family and Child Advocacy clinic. At this time, the children were evaluated for concerns of physical abuse. There was no mention of any suspicion of sexual abuse at this time.

4.  While being evaluated at the Midlands Family and Child Advocacy Center, both B.D.H. and B.J.H. underwent genitourinary exams. Consent by Sheila or James Hart, the patients' mother and father, was not obtained for these exams.

5.  During the forensic medical exams, B.D.H. and B.J.H. were instructed to remove their clothing, and an invasive forensic medical examination was performed on each child.

6.  After the exams were completed and the children were reunited with their family, B.D.H. told his mother that his private body parts had been "messed with" and "touched;" the child expressed to his mother that he did not understand why this was done and wanted to know why.

7.  The standard of care (SOC) for the pediatric genitourinary exam is that invasive exams should be performed only when absolutely necessary. The SOC dictates that an adolescent should be permitted to have a parent in the room at the time of the exam. The exam should be explained in detail to the patient, and consent should be obtained.

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

ELECTRONICALLY FILED - 2024 May 15 12:16 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4002999

The SOC further delineates that, if a child does not want to cooperate, the exam should be postponed in order to prevent unnecessary trauma for the patient. Pediatric patients should also be allowed to remain as clothed as possible for the exam, with only the necessary parts of the body exposed at the time of the practitioner's examination.

8. Based on my review of the above records, it is my opinion that, within a reasonable degree of medical probability, the standard of care for a pediatric genitourinary exam was significantly breached in the cases of B.D.H., B.J.H., and W.H. These minors were not informed that an invasive genital exam would be performed on their penises, scrotums, and anuses, and they were told the exam was to evaluate for bodily bruising. Consent was not obtained from either patient. The children were forced to fully disrobe. The patients denied any instances of sexual abuse, but invasive exams were completed anyway. The legal parent did not consent to these exams. The legal parent was not allowed to remain with the children for these exams. A deviation from the standard of care for the ethical pediatric GU exam can result in significant trauma to the pediatric patient. It is my opinion that the SOC was violated and resulted in trauma for B.D.H, B.J.H, and W.H.

9. My opinion has never been disqualified in any court.

10. I certify that I have not been found guilty of fraud or perjury in any jurisdiction.

11. Under penalties of perjury, I certify that I have read the foregoing and that the facts stated in it are true.

Kate H Wise, DNP, FNP-BC

The foregoing instrument was acknowledged before me this 26 day of April, 2024, by
Kate Wise .

Signature of Notary

Tiffany Mikuley (or

Name of Notary (typed or stamped)