IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Jane Doe *by and through her next friend and natural parent N.O.*; M.F. *by and through her next friend, Ashley Berry, Esq.*; B.D.H. *by and through their next friends, Sheila Hart and James Hart*;   B.J.H. *by and through their next friends, Sheila Hart and James Hart*; W.H. *by and through their next friends, Sheila Hart and James Hart,* | ) ) ) ) ) ) ) ) ) ) | Case No. 3:24-cv-04141-JDA<br><br><br>OPINION AND ORDER |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Prisma Health Medical Group; Midlands Family and Child Advocacy Clinic; Olga Rosa, M.D.; Shelby Brady, FNP-C; Jennifer Leigh Sabo, M.D.; Ladonna Alexandria Young, M.D.; Susan Michelle Lamb, M.D., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This case is before the Court on a motion to dismiss by Defendants Susan Michelle Lamb, M.D. ("Dr. Lamb"); Olga Rosa, M.D. ("Dr. Rosa"); and Ladonna Alexandria Young, M.D. ("Dr. Young") (collectively, the "Supervisor Defendants") and motions to dismiss and to strike class allegations by Defendants Prisma Health Medical Group – Midlands ("Prisma Health"); Midlands Family and Child Advocacy Clinic (the "Clinic"); Shelby Brady,

FNP-C ("Nurse Brady"); and Jennifer Leigh Sabo, M.D ("Dr. Sabo") (collectively, the "Prisma Defendants").[1] [Docs. 7; 10; 11.]

This action alleges state and federal constitutional violations arising out of forensic medical examinations of children who were suspected of having been abused (the "Examinations"). [Doc. 1-3.] Plaintiffs (the "Children") filed this action in the Richland County Court of Common Pleas on May 15, 2024. [*Id.*] Defendants removed the action to this Court on July 25, 2024. [Doc. 1.] On July 26 and July 31, 2025, the Supervisor Defendants and the Prisma Defendants filed motions to dismiss for failure to state a claim and the Prisma Defendants filed a motion to strike class allegations. [Docs. 7; 10; 11.] The Children filed responses opposing all three motions on August 26, 2024. [Docs. 14–16.] On September 3, 2024, the Prisma Defendants filed a reply to the Children's response to their motion to dismiss. [Doc. 22.]

On February 7, 2025, the Court issued a Text Order requiring the Children to show cause why their claims for money damages against Nurse Brady and Drs. Rosa, Sabo, Young, and Lamb should not be dismissed on the basis of qualified immunity because it cannot be reasonably inferred from the allegations in the Complaint that any reasonable person in the position of these Defendants would have realized that the Children had not consented to the examinations that are the subject of the Complaint. [Doc. 26.] The Children filed their response on February 21, 2025, and the Supervisor Defendants and

---

[1] In their motion to dismiss, the Prisma Defendants state that Prisma Health Medical Group – Midlands is improperly identified in the Complaint as "Prisma Health Medical Group." [Doc. 10 at 1.] They also explain that the Clinic is not a separate legal business entity, and instead is part of Prisma Health. [*Id.* at 1 n.1.]

the Prisma Defendants filed replies on February 27 and 28, 2025.  [Docs. 30–32.]  On June 26, 2025, the Court further directed the Children to show cause why their claims for injunctive relief against Drs. Rosa and Lamb should not be dismissed for lack of standing for reasons the Supervisor Defendants had argued in their motion to dismiss.  [Doc. 38.]  The Children did not file a response.  The Supervisor Defendants filed a response on July 8, 2025.  [Doc. 39.]  The three motions are now ripe for review.

## BACKGROUND[2]

**General Allegations**

Prisma Health is a nonprofit medical group providing health care services throughout South Carolina.  [Doc. 1-3 ¶ 54.]  The Clinic is a medical clinic operating in Columbia, South Carolina, under Prisma Health.  [*Id.* ¶ 61.]  Its pediatric child abuse team provides comprehensive medical evaluations for children who are suspected victims of abuse or neglect throughout South Carolina.  [*Id.*]

Nurse Brady and Drs. Rosa, Sabo, Young, and Lamb are employed by Prisma Health at the Clinic.  [*Id.* ¶ 62.]  Dr. Rosa is a physician licensed by the South Carolina Medical Board with specialties in pediatrics and pediatric child abuse.  [*Id.* ¶ 63]  She is the director for Prisma Health's child abuse pediatrics care team and is responsible for its policies, procedures, and practices.  [*Id.*]  Nurse Brady is a nurse licensed by the South Carolina Nursing Board as an advance practice nurse and registered nurse.  [*Id.* ¶ 64.]  Dr. Sabo is a physician licensed by the South Carolina Medical Board with specialties in

---

[2] Except as to the completion of the consent forms, which will be discussed, the facts in this section are taken directly from the Children's Complaint.

pediatrics. [*Id.* ¶ 65.] Drs. Young and Lamb are listed as Nurse Brady's supervising or collaborating physicians. [*Id.* ¶¶ 66–67.]

The Children are five children for whom the South Carolina Department of Social Services ("DSS") received reports of abuse or neglect. [*Id.* ¶¶ 8, 24, 40, 41.] DSS informed the biological and custodial parents of each child of the allegations of abuse it had received, and it referred each child to Prisma Health, the Clinic, and either Nurse Brady or Dr. Sabo for a medical examination. [*Id.* ¶¶ 8, 9, 24, 25, 40, 41, 42.]

For each child, DSS caseworkers gave the parents or caregivers (the "Caregivers") a form entitled "Consent for Medical Diagnosis and Treatment" (the "Consent Form") before the exam. [*Id.* ¶ 115.] The form states as follows:

> I, _____, in my capacity as ____[3] of the child named below, consent to a physical exam concerning allegations or suspicions of maltreatment, and if necessary to collect evidence and provide treatment. This procedure has been fully explained to me, and I understand that this examination may include clinical observation for evidence of physical or sexual abuse or both, and tests for sexually transmitted diseases (STDs). In addition, I consent to photographs and/or X-rays of any significant findings. I do consent to the use of these photographs or X-rays by the facility, or its staff, for medical, teaching, and/or legal purposes. I fully understand the nature of the examination and medical information obtained by this means may be used as evidence in a court of law or in connection with the enforcement of public health rules and laws. I do consent to HIV antibody testing if found necessary by the healthcare provider. I understand that if HIV testing is done, information regarding that test will be explained to me by the healthcare provider. I understand a

---

[3] After "in my capacity as," the form lists "Mother," "Father," "Legal Representative," and "Other: (please specify relationship to child)" and asks the consenting party to circle the correct choice. [Docs. 1 ¶ 115; 10-1.]

positive or negative test may need to be confirmed or
repeated at a later date.

[*Id.* (footnote added); Doc. 10-1 (footnote added).]  Under that language on the form there
are spaces for the child's name, date of birth, and age.[4]  [Doc. 10-1.]  Then the form
states, "By signing below, I consent to the diagnosis and treatment of the named child as
described above," and it leaves spaces for the signatures and printed names of two
parents or legal representatives, along with a space for the date.  [*Id.*]  Additionally, there
are spaces for the signature of a witness, the printed name of the witness, and the date.
[*Id.*]

For each child, the Consent Form was filled out and signed without any additions
or cross-outs.  [*Id.*]  Each child then underwent the Examination, which included, among
other things, examining the boys' penises and the inside of their rectums and examining
the inside of the girls' vaginas.  [Doc. 1-3 ¶¶ 16, 35, 51.]  The Children allege that, as a

---

[4] The Complaint alleges that the Caregivers of each child were given the Consent Form
and includes a picture of the top portion of the form.  [Doc. 1-3 ¶ 115.]  The Prisma
Defendants have attached to their motion to dismiss what they represent are the actual,
completed forms that were returned for each child.  [Doc. 10-1.]  On a motion to dismiss,
a court may consider, without converting the motion to dismiss to a motion for summary
judgment, "official public records, documents central to plaintiff's claim, and documents
sufficiently referred to in the complaint so long as the authenticity of these documents is
not disputed."  *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006).  The
Court concludes that it may consider the completed forms the Prisma Defendants have
submitted because the Children sufficiently referenced and relied on the Consent Form
in their Complaint, and they have not questioned the authenticity of the documents.
[Docs. 1-3; 15.]

result of the Examinations, they suffered degradation and physical, psychological, and emotional harm, and that they will suffer future emotional harm. [*Id.* ¶¶ 4, 183.]

**Allegations Concerning Individual Children**

### *Jane Doe*

On approximately, May 10, 2021, DSS informed the biological and custodial parent of Plaintiff Jane Doe that DSS had received the following allegations:

> [N.O.] is physically abusive towards her daughter ([Jane Doe] age; 12 yr. old). The reporter stated that [N.O.] sometimes makes [Jane Doe] take off her clothes except for her under garments and then beat her with a belt. The reporter stated that [Jane Doe] has a slight welt on her arm, which is fading away. It is alleged that [N.O.] hit [Jane Doe] on yesterday. It is alleged that [N.O.] limits the amount of food [Jane Doe] can eat a day. It is alleged that [Jane Doe] can sometimes only eat twice a day or nothing at all. It is alleged that [N.O.] makes [Jane Doe] wash her own cloth[e]s by hand while everyone else in the home use[s] a washing machine. It is alleged that [N.O.] threatened to kill her if she tells anyone about the abuse in the home. It is alleged that [Jane Doe] is afraid to go home.

[*Id.* ¶ 8 (internal quotation marks omitted) (some alterations in original).]

On May 17, 2021, DSS sent a referral for Jane Doe to Prisma Health, the Clinic, and Nurse Brady for a forensic medical exam. [*Id.* ¶ 9.] Under "Reason for Current Intake / Referral check all that apply," DSS marked only "Physical Abuse" and left the box for "Sexual Abuse" unmarked. [*Id.* (internal quotation marks omitted).]

Jane Doe's Examination took place on May 25, 2021. [*Id.* ¶ 17.] During the exam, Nurse Brady asked Jane Doe if her father and/or brothers molested her, and she said they did not. [*Id.* ¶ 16.] Jane Doe was instructed to remove all of her clothing. [*Id.*] She told the medical personnel several times that she wanted them to stop the exam, but her

requests were denied and the Examination continued.  [*Id*.]  As part of the exam, her breasts were touched, she was made to spread her legs, fingers were used to open her vagina, instruments were inserted, and pictures were taken.  [*Id*.]

### M.F.

On January 24, 2023, DSS informed the biological and custodial parent of Plaintiff M.F. that DSS had received the following abuse allegations:

> [Mother], adoptive mother lives in the home with [Plaintiff M.F.'s sister, N.F.] 16, [M.F.] 16, [].  Also in the home are [Mother's Boyfriend] and [C].  Saturday night the family was having a gathering about issues going on in the home.  It is alleged that one time [Mother's Boyfriend] walked in the room where [N.F.] and [M.F.] were changing and hid while the girls undressed.  When this was brought up [Mother's Boyfriend] got upset and left the home (Drove off).  [Mother] then kicked [N.F.] and [M.F.] out of the home.  The 2 girls went to Charlotte, NC.  It is alleged that [Mother's Boyfriend] also had a picture of [N.F.] saved as the screen saver on his phone.  [N.F.] and [M.F.] are getting frustrated because they are having to watch the younger kids while they are on virtual school.  [Mother] goes out with [Mother's Boyfriend].  The girls are in Charlotte and [Mother] has sent someone to go get them from the home they are at.

[*Id.* ¶ 24 (internal quotation marks omitted) (some alterations in original).]

On March 14, 2023, DSS sent a referral for a forensic medical exam to Prisma Health, the Clinic, and Dr. Sabo.  [*Id.* ¶ 25.]  Under "Reason for Current Intake / Referral check all that apply," DSS marked only "Physical Abuse" and left "Sexual Abuse" unmarked.  [*Id.* (internal quotation marks omitted).]

Prisma Health, the Clinic, and Dr. Sabo obtained information from forensic interviews of M.F. and N.F.,[5] which were held before M.F.'s forensic medical examination.

---

[5] N.F., M.F.'s sister, is not a Plaintiff in this case.

[*Id.* ¶ 27.] From M.F.'s forensic interview, Prisma Health, Midlands, and Dr. Sabo learned the following information: "[M.F.] [did] not dis[cl]ose any concerns for abuse. She stated the report was made by her sister who doesn't like her adoptive mother's boyfriend. [M.F.] stated she feels safe at home. Her physical exam, to include anogenital exam, was normal."[6] [*Id.* ¶ 28 (internal quotation marks omitted).] From N.F.'s forensic interview, Prisma Health, the Clinic, and Dr. Sabo learned the following information:

> [N.F.] did not dis[cl]ose any concerns for abuse. She stated the report was made by her sister who doesn't like her adoptive mother's boyfriend. [N.F.] stated she feels safe at home. Her physical exam, to include anogenital exam, was normal.
>
> Of note, [N.F.] indicated previous sexual activity at 11 years of age with 2 male peers (11 years old) at the time she lived with her biological mother. She denies any recent sexual activity. [N.F.] stated her adoptive mother was aware of this. [N.F.] also indicated a previous history of sending naked photos of herself to peers approximately 1 year[] prior. She stated her adoptive mother was aware and this was the primary reason she is in counseling. She endorsed shame and labeled herself as "troubled."

[*Id.* ¶ 30 (internal quotation marks omitted) (some alterations in original).]

According to M.F.'s history recorded by Prisma Health, the Clinic, and Dr. Sabo, M.F. reported living with her adopted mother and siblings. [*Id.* ¶ 29.] She claimed that her 34-year-old sister, who did not like her mother's boyfriend, was the source of the DSS allegation and that no one had done anything to her feelings or body to harm her. [*Id.*]

As noted, M.F.'s Examination took place after the forensic interviews. [*Id.* ¶ 27.] During the exam, M.F. again denied that anyone had molested her. [*Id.* ¶ 35.] She was

---

[6] The Complaint does not explain how the forensic interview provided information about the results of the physical exam, which had supposedly not yet occurred.

required to completely undress; her body was touched, including "[f]ingers and/or instruments [being] placed in [her] vagina[,] causing pain"; and pictures were taken.  [*Id.*]

**B.D.H, B.J.H., and W.H.**

Plaintiffs B.D.H., B.J.H., and W.H. (the "Three Boys") are brothers.  [*Id.* ¶ 38.] B.D.H. was born in October 2012; B.J.H., in June 2016; and W.H., in August 2020.  [*Id.* ¶ 39.]  On May 12, 2021, DSS informed the Three Boys' biological and custodial parents that DSS had received the following allegations of physical abuse and exposure to domestic violence:

> James Hart and [Sheila] Fowler are the parents of [B.J.H.] (4) and [B.D.H.] (8).  It has been reported that James was physically abusive towards [Sheila] on 05/11/2021.  James threw [Sheila] on the floor and began to kick her.  About a week ago James choked [Sheila].  Both incidents happened in the presence of the children.  James has also thrown [B.D.H.] on the bed and hit him (no marks/bruises).

[*Id.* ¶ 40 (internal quotation marks omitted) (some alterations in original).]

On May 13, 2021, DSS informed the Three Boys' biological and custodial parents that DSS had received the following additional allegations of physical abuse:

> There are concerns on May 12, 2021 minor child [B.D.H.] (8) was left in the basement of . . . the home without lights or a window and was not given dinner, allegedly for "Talking to[o] much[."]  There are also concerns that [B.D.H.] was observed on May 13, 2021 with bruising on his arms that appeared to be yellow and purple in color and resembles finger prints. There are concerns that the explanation for the bruise[] was that the child fell off of[] a ladder but the injuries [do] not match the explanation.  There are concerns that both children

> [B.D.H.] and [B.J.H.] (4) seem fearful.  The children reside with
> their parents Shelia Fowler and James Hart.

[*Id.* ¶ 41 (internal quotation marks omitted) (some alterations in original).]

On May 18, 2021, DSS sent a referral for a forensic medical exam to Prisma Health, the Clinic, and Nurse Brady.  [*Id.* ¶ 42.]  Under "Reason for Current Intake / Referral check all that apply," DSS marked only "Physical Abuse" and left the box for "Sexual Abuse" unmarked.  [*Id.* (internal quotation marks omitted).]  In the narrative for "Suspect / Allegation Information" for the Three Boys, DSS wrote, "B.D.H. had multiple marks and bruises on his arms and face.  He told 3 of his teachers/school officials that he was put in a basement.  He told DSS that he fell off a m[er]ry-go-round at school."  [*Id.* ¶ 44.]

On May 24, 2021, the Three Boys underwent their Examinations, during which they were each asked if anyone molested them, and they denied that anyone had.  [*Id.* ¶¶ 46–48, 51.]  Each was made to completely disrobe; their bodies were touched; their penises were held and touched; fingers and/or instruments were placed in their anuses; and pictures were taken.  [*Id.* ¶ 51.]

**The Children's Legal Claims**

The Children allege four claims asserting that the manner in which the examinations were performed violated their rights under the South Carolina and United States Constitutions.  They first allege that Defendants violated their right to privacy under Article I, Section 10 of the South Carolina Constitution ("Section 10") by "forcing children who are suspected of being abused or neglected to undergo unnecessary pediatric

genitourinary examinations" ("Claim One").  [*Id.* ¶ 145; *see id.* ¶¶ 141–44, 146–48.]  They next allege the same conduct violated their right to procedural and substantive due process under Article I, Section 3 of the South Carolina Constitution ("Section 3") ("Claim Two").  [*Id.* ¶¶ 149–57.]  Their final two claims allege that this same conduct violated their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution ("Claims Three and Four").  [*Id.* ¶¶ 158–85.]  As remedies for Claims One, Two, and Three, the Children seek declaratory and injunctive relief.  [*Id.* ¶¶ 148, 157, 168, 169.]  They also seek attorneys' fees and costs under Claim Three.  [*Id.* ¶ 170.]  For Claim Four, they request actual damages, punitive damages, and court costs.[7]  [*Id.* ¶ 185.]

## APPLICABLE LAW

### Section 1983

42 U.S.C. § 1983 provides a private cause of action for constitutional violations by persons acting under color of state law.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).  Accordingly, a civil action under § 1983 allows "a party who has been deprived of a federal

---

[7] The Children also seek designation as class representatives for a putative class action.  [*Id.* ¶¶ 127–40.]  However, because the Court concludes, for the reasons to be discussed, that none of the individual plaintiffs have adequately alleged a constitutional violation, the Court need not address the class allegations.  *See Bass v. Butler*, 116 F. App'x 376, 385 (3d Cir. 2004) ("Because no class has been certified here, if [plaintiff's] claim fails, the entire action must be dismissed."); *Jenkins v. CARCO Grp., Inc.*, 339 F. Supp. 3d 1223, 1231 (D. Kan. 2018).  Accordingly, the Prisma Defendants' motion to strike class allegations [Doc. 11] is found as moot.

right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

**Motion to Dismiss Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Lab's, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31–32 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d).

With respect to well pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

> obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability.  *Twombly*, 550 U.S. at 557; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).  Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

**DISCUSSION**

Defendants argue, in part, that the Court should dismiss the Complaint because the Children have not pled facts to support the required elements of their causes of action, as required by *Twombly* and *Iqbal*.  [Docs. 7-1 at 3–7; 10 at 3–8, 10–12.]  The Court agrees.

**The Applicable Governing Constitutional Provisions**

Initially, the Court notes that although the Children claim the Examinations violated multiple provisions of the South Carolina and United States Constitutions, the claims are properly analyzed under the Fourth Amendment to the United States Constitution and Section 10 of the South Carolina Constitution.[8]  The Supreme Court has held that "if a constitutional claim is covered by a specific [federal] constitutional provision, such as the

———————————————

[8] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Section 10 provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. Const. art. I, § 10.

14

Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see Portuondo v. Agard*, 529 U.S. 61, 74 (2000) (rejecting a habeas petitioner's Fourteenth Amendment due process claim that was based on the alleged violation of his Fifth and Sixth Amendment rights because "where an Amendment provides an explicit textual source of constitutional protection that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing the claims" (cleaned up)).  The Court has no reason to believe the Supreme Court of South Carolina would apply a different rule in construing Section 10.

Here, the Examinations clearly constituted searches within the meaning of the Fourth Amendment and Section 10.  *See Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999) (holding that a medical examination of a child's vagina and surrounding areas for evidence of sexual abuse constituted a search within the meaning of the Fourth Amendment).  The Court therefore dismisses the Children's other federal constitutional claims—including due process claims—for this reason.[9]  And because "South Carolina courts apply the same analysis to state and federal due process claims," *Bixby v. Stirling*, No. 3:24-cv-05072-JDA, 2024 WL 4627451, at *14 n.18 (D.S.C. Oct. 30, 2024); *Dangerfield v. State*, 656 S.E.2d 352, 354 (S.C. 2008) (applying federal due process law

---

[9] The Court further notes that, although the Children conclusorily allege violations of their rights under the First, Fifth, and Sixth Amendments [Doc. 1-3 ¶¶ 167, 178], they offer no explanation of why they contend that is the case.

to claims under both the Fourteenth Amendment and Section 3), the Court also dismisses the Children's claims to the extent they allege violations of Section 3.

**Analysis of the Fourth Amendment and Section 10**

The Court therefore turns to the question of whether the Children have adequately alleged that the Examinations violated their rights under the Fourth Amendment and/or Section 10.  The Prisma Defendants contend that the Children do not adequately allege a violation of either provision because they do not plausibly allege that the Examinations were not authorized by the Caregivers' consent.  [Doc. 10 at 11–12.]  In response, the Children do not deny that the Caregivers effectively consented to forensic examinations by completing and signing the Consent Form.  [Doc. 15 at 6–7.]  However, they contend that they have adequately alleged that the invasive nature of the exams that were actually conducted exceeded the scope of any consent given.  [*Id.*]  The Court disagrees.[10]

The Supreme Court has "long approved consensual searches [under the Fourth Amendment] because it is no doubt reasonable for [state actors] to conduct a search once they have been permitted to do so."  *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991).  The same is true of the Supreme Court of South Carolina and Section 10.  *See, e.g.*, *State v. Forrester*, 541 S.E.2d 837, 841 (S.C. 2001).  However, under both the federal and state standards, individuals consenting to searches "are free to limit the scope of the searches to which they consent."  *Id.* at 843; *see Jimeno*, 500 U.S. at 252.  Thus, when a state actor relies on consent as the authority to search, the "search must not exceed

---

[10] Because the Court concludes that its analysis of this argument raised by the Prisma Defendants warrants dismissal of the entire action, the Court focuses on that issue.

16

the scope of the consent granted or the search becomes unreasonable" within the meaning of Section 10 and the Fourth Amendment. *Forrester*, 541 S.E.2d at 843; *see Jimeno*, 500 U.S. at 252. Importantly, under both standards, the scope of consent is measured not by the consenting party's subjective intentions but "by a test of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[11] *State v. Mattison*, 575 S.E.2d 852, 856 (S.C. Ct. App. 2003) (internal quotation marks omitted) (quoting *Jimeno*, 500 U.S. at 251). Therefore, if the consent given "would reasonably be understood" to cover a particular type of search, there are no constitutional "grounds for requiring a more explicit authorization." *Jimeno*, 500 U.S. at 252; *see Mattison*, 575 S.E.2d at 856–57.

Here, the Court concludes that the Children have not plead facts from which it could be reasonably inferred under the *Iqbal/Twombly* standard that the Examinations were not constitutionally authorized by the Caregivers' consent. The Complaint alleges that the Caregivers of each child were provided with the Consent Form. [Doc. 1-3 ¶ 115.] The form requests "consent to a physical exam concerning allegations or suspicions of maltreatment, and if necessary to collect evidence and provide treatment." [*Id.*] It explains that the "examination may include clinical observation for evidence of physical

---

[11] Neither the federal nor the state standard requires a state actor conducting a search to inform the consenting party of the right to refuse. *Schneckloth v. Bustamonte*, 412 U.S. 218, 231–33 (1973); *Forrester*, 541 S.E.2d at 841. Still, any consent must be voluntary, rather than the product of duress or coercion. *Schneckloth*, 412 U.S. at 228; *Forrester*, 541 S.E.2d at 841. And, in the medical context, the consenting party must also be informed that a purpose of the search is for law enforcement purposes. *See Ferguson v. City of Charleston*, 308 F.3d 380, 397 (4th Cir. 2002). Plaintiffs do not appear to deny that the Caregivers were informed of the law enforcement purpose of the search. Nor do they allege that any consent was obtained by duress or coercion.

or sexual abuse or both, and tests for sexually transmitted diseases (STDs)."  [*Id.*]  The

Consent Form also advises that the information obtained "may be used as evidence in a

court of law or in connection with the enforcement of public health rules and laws."  [*Id.*]

It requests "consent to HIV antibody testing if found necessary by the healthcare provider"

and consent to "photographs and/or X-rays of any significant findings" so that they could

be used "for medical, teaching, and/or legal purposes."  [*Id.*]

The Court concludes that the only reasonable inference from the facts alleged is

that the Consent Form seeks consent to "clinical[ly] observ[e]" the subject child for

evidence of "sexual abuse."  [*Id.*]  Accordingly, a typical reasonable person would

conclude that a parent or guardian who completed and signed the form without

modification was giving unqualified consent for such an exam.  *See United States v.*

*Alvarez-Herrera*, No. 5:13-CR-61-FL, 2013 WL 6531175, at *6 (E.D.N.C. Dec. 12, 2013)

(holding that consent was unqualified when the consent form did not set any conditions

on the search and the person filling out the consent form "did not write any notations

restricting the search, [but] simply provided her signature").  Although the Children allege

that examining their penises, vaginas, and rectums exceeded the scope of any consent

given [Doc. 1-3 ¶¶ 158–85], that conclusion is not reasonably inferable from the facts

alleged in the Complaint.  Rather, a typical reasonable person would understand consent

to "clinical observation [of a child] for evidence of . . . sexual abuse . . . and tests for

sexually transmitted diseases" [*id.* ¶ 115] to include consent to examination of the child's penis or the inside of the child's vagina or rectum.[12]

In their memorandum opposing the Prisma Defendants' motion to dismiss, the Children offer only a brief response to the argument that they do not adequately allege that the exams exceeded the scope of the consent given. [Doc. 15 at 6–7.] Notwithstanding the Consent Form's multiple specific references to evidence of sexual abuse, the Children assert that the Consent Form should be interpreted in conjunction with the "[c]ommon sense" premise that, when examining a child for signs of abuse, the scope of the exam would be limited to the specific type of abuse alleged, which, here, was not sexual in nature. [*Id.*; *see also* Doc. 1-3 ¶¶ 151, 160, 163, 174, 177.] It is not apparent to the Court, however, why concerns that a child is being abused in one way would not also give rise to concerns that the child was being subjected to other types of

---

[12] The Complaint, in its fact section, alleges that, during her Examination, Jane Doe asked that her Examination be stopped but that her request was denied. [*See* Doc. 1-3 ¶ 16.] However, the Children do not appear to assert that Defendants needed Jane Doe's consent if her Caregivers consented to the Examination. [*Id.* ¶¶ 141–85]; *see also Parham v. J.R.,* 442 U.S. 584, 602–04 (1979) (explaining that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children); *see Tenenbaum*, 193 F.3d at 599 (holding that subjecting a child to invasive investigatory medical examination in the course of an abuse investigation requires a court order *absent parental consent*).

The Complaint's fact section also includes the allegation that "[p]hotos were taken of Plaintiff Children's genitalia even when no significant findings were found." [Doc. 1-3 ¶ 117.] The Children do not appear to base any of their four claims on that fact [*see id.* ¶¶ 141–85], and they do not cite the fact as a basis for denying the motions to dismiss. In any event, the allegation that photos were taken even when no significant findings were found is too conclusory to constitute a well pled fact under *Iqbal* and *Twombly*, especially considering that a "significant finding" could have included that there was no evidence of sexual abuse.

mistreatment. Rather, it would seem that the question of whether it would make sense to look for evidence of sexual abuse in such cases would depend upon subjective factors such as: how likely it is that a child being subjected to non-sexual abuse is also being subjected to sexual abuse; how likely the exam is to uncover evidence of sexual abuse if such abuse is occurring; and what negative effects, if any, the exam would be likely to have on the child. There are likely significant efficiency benefits to asking parents or caregivers to sign a relatively broad and standard consent form so that the provider would have broad discretion to conduct the investigation that he or she deemed appropriate under the circumstances. All of this is to say that it is not somehow inherently unbelievable that Defendants would request consent to examine a child who has been subjected to non-sexual abuse for signs of sexual abuse as well, especially when the facts necessitating the investigation are not included on the consent form. The language of the forms thus sufficiently conveys that it was requesting consent for an exam seeking evidence of both physical and sexual abuse.

The Children also point to a number of facts alleged in the Complaint that tend to show that, regardless of how the hypothetical reasonable person would interpret the language of the Consent Form, the Caregivers did not *actually* understand that they were consenting to an invasive exam where medical personnel would be looking for evidence of sexual abuse. They point out, for example, that Jane Doe's mother did not speak or read English. [Doc. 1-3 ¶ 17.] They also allege that Defendants did not explain the scope of the medical exams to the Caregivers. [*See*, *e.g.*, *id.* ¶ 119]. But the Children do not allege that Defendants had any reason to know that Jane Doe's mother did not speak or

read English, nor do they allege that Defendants had reason to know that any Caregivers wished to ask questions about the examination before consenting to it. In fact, as to the latter point, the Consent Form specifically stated, "This procedure has been fully explained to me, and I understand that this examination may include clinical observation for evidence of physical or sexual abuse or both, and tests for sexually transmitted diseases." [*Id.* ¶ 115.] The Children also allege that the Caregivers were not "allowed" to be present with them during the Examinations. [*Id.* ¶103.] But the Children do not allege that any of the Caregivers who completed and signed the Consent Form conditioned their consent on their being present during the Examinations or that they sought to withdraw their consent when they realized they would not be allowed to be present. In short, to the extent that the Caregivers did not *subjectively intend* to consent to the examination for any of these reasons, the Children have not adequately alleged that Defendants had any knowledge of that such that it would affect how a typical reasonable person would interpret their completion of the Consent Form.[13]

Because the Children's allegations fail to state a violation of either the Fourth Amendment or Section 10, the Prisma Defendants' motion to dismiss is granted. Additionally, although the Supervisor Defendants do not argue that the Children have failed to adequately allege that the Examinations exceeded the scope of the consent

---

[13] In their Complaint, the Children make no allegations whatsoever about any reaction that the Caregivers had to the Consent Form or even whether or how they filled it out. [Doc. 1-3.] Their silence is insufficient under *Twombly* to push their right to relief beyond a "speculative level" so that the Complaint's well pled allegations, taken as true, would give rise to a reasonable inference that the Examinations were not authorized by the Caregivers' consent. *Twombly*, 550 U.S. at 555.

given, the Court's conclusions regarding the Children's failure to plausibly allege such an

exceedance applies to all Defendants, and thus the Court also grants the Supervisor

Defendants' motion to dismiss for this reason.[14]  *See Hill v. United Air Lines, Inc.*, No.

---

[14] Because the Children fail to adequately allege a violation of the United States Constitution, the Supervisor Defendants and the individual Prisma Defendants are also entitled to dismissal of the claims against them on the basis of qualified immunity to the extent that Plaintiffs seek money damages.  *See Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025).  Indeed, the Court notes that in response to this Court's Order requiring Plaintiffs to show cause why their claims against Dr. Rosa, Nurse Brady, Dr. Sabo, Dr. Young, and Dr. Lamb "for money damages should not be dismissed on the basis of qualified immunity insofar as it cannot be reasonably inferred from the allegations in the Complaint that any reasonable person in the position of these [D]efendants would have realized that Plaintiffs had not consented to the examinations that are the subject of the Complaint," Plaintiffs filed a brief that did not address that issue.  [*See* Doc. 30.]

The Prisma Defendants also argue that the Children do not adequately allege that Defendants are state actors [Doc. 10 at 3–8]; that any claim for money damages under the South Carolina Constitution fails because there is no private right of action for money damages under the South Carolina Constitution [*id.* at 10–11]; that that the Clinic must be dismissed because it is not a legal entity [*id.* at 12–13]; and that the Complaint does not comply with Rule 8 of the Federal Rules of Civil Procedure [*id.* at 13–16.]  The Supervisor Defendants further argue that this case should be dismissed as duplicative of State Civil Action Number 2024-NI-40-00031 [Doc. 7-1 at 7–9]; and that the Children fail to state a claim because the Complaint contains no allegation of personal involvement by any of them in connection with the claims relating to the Children's medical care [*id.* at 3–7].  The Court need not address any of these arguments in light of the Court's conclusion that the Children's claims fail because they do not adequately allege lack of consent. Although the Supervisor Defendants allege that their lack of personal involvement in any constitutional violation deprives the Children of standing concerning the claims against them [*id.* at 9–12], "[w]hether a defendant was personally involved in an alleged violation of constitutional rights goes to the merits of the claim, not whether the Court has jurisdiction over it."  *Banks v. Gammon*, No. 3:08-CV-0474-K, 2009 WL 3334621, at *3 n.2 (N.D. Tex. Oct. 14, 2009); *see Coakley v. Welch*, 877 F.2d 304, 306 (4th Cir. 1989) (noting that "a claim of lack of personal involvement is a merits defense in a § 1983 action").  The Supervisor Defendants also argue that the Children lack standing to seek injunctive relief against Dr. Rosa, who is retired, and Dr. Lamb, who is no longer employed by the University of South Carolina.  [Doc. 7-1 at 12.]  However, because the Children have standing to seek injunctive relief against at least one Defendant, the Court need not address this issue.  *See Cutter v. Wilkinson*, 544 U.S. 709, 712 n.1 (2005) ("Without doubt, a live controversy remains among the still incarcerated petitioners, the United States, and respondents.  We do not reach the question whether the claims of [the

2:10-cv-3243-RMG-BM, 2011 WL 1113499, at *2 (D.S.C. Mar. 24, 2011) ("Although [the non-moving defendant] has not joined in the motion to dismiss, the same law and reasoning applies and thus also precludes [the] plaintiff's claim against [the non-moving defendant].").

## **CONCLUSION**

Wherefore, based upon the foregoing, Defendants' motions to dismiss [Docs. 7; 10] are GRANTED; the Children's claims are DISMISSED without prejudice; and the Prisma Defendants' motion to strike class allegations [Doc. 11] is FOUND AS MOOT.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

July 29, 2025
Columbia, South Carolina

---

released prisoners] continue to present an actual controversy."); *Abrahamson v. Neitzel*, 109 F. Supp. 3d 1055, 1057 n.1 (W.D. Wisc. 2015) ("For now, the court is satisfied that this case contains at least one plaintiff with standing and one defendant against whom injunctive relief would be proper."). Finally, The Supervisor Defendants argue that they are entitled to sovereign immunity regarding any damages claims asserted against them in their official capacities. [Doc. 7-1 at 2–3.] In response, the Children clarify that they are not seeking money damages against these Defendants in their official capacities. [Doc. 14 at 5.]